WEST HARTFORD INTERFAITH COALITION, INC. *v.*
TOWN COUNCIL OF THE TOWN OF
WEST HARTFORD
(14686)

PETERS, C. J., CALLAHAN, BERDON, KATZ and PALMER, Js.

Argued October 26, 1993—decision released February 8, 1994

*Marjorie Wilder,* corporation counsel, for the appellant (defendant).

*Jeffrey J. Mirman,* with whom was *Robin Messier Pearson,* for the appellee (plaintiff).

*Philip D. Tegeler* filed a brief for the Connecticut Civil Liberties Union Foundation et al. as amici curiae.

KATZ, J. The principal issue in this appeal is whether the defendant, the West Hartford town council, acting in its capacity as the zoning authority for West Hartford,[1] properly denied the application of the plaintiff, West Hartford Interfaith Coalition, Inc., for a zone change and special development district designation to construct ten units of affordable housing on property located in West Hartford. The plaintiff appealed to the trial court, pursuant to General Statutes § 8-30g,[2] from

---

[1] The defendant derives its zoning authority from special acts of the General Assembly. 19 Spec. Laws 934, §§ 1 through 6 (1925); 20 Spec. Laws 188 (1927); 22 Spec. Laws 473, § 172 (1935); see also *Cascio* v. *Town Council,* 158 Conn. 111, 113, 256 A.2d 685 (1969); *Clark* v. *Town Council,* 145 Conn. 476, 480–81, 144 A.2d 327 (1958); *Sullivan* v. *Town Council,* 143 Conn. 280, 288, 121 A.2d 630 (1956).

[2] General Statutes § 8-30g provides: "AFFORDABLE HOUSING LAND USE APPEALS PROCEDURE. (a) As used in this section: (1) 'Affordable housing development' means a proposed housing development (A) which is assisted housing or (B) in which not less than twenty per cent of the dwelling units will be conveyed by deeds containing covenants or restrictions which shall require that such dwelling units be sold or rented at, or below, prices which will preserve the units as affordable housing, as defined in section 8-39a, for persons and families whose income is less than or equal to eighty per cent of the area median income, for at least twenty years after the initial occupation of the proposed development; (2) 'affordable housing application' means any application made to a commission in connection with an affordable housing development by a person who proposes to develop such affordable housing; (3) 'assisted housing' means housing which is receiving, or will receive, financial assistance under any governmental program for the construction or substantial rehabilitation of low and moderate income housing, and any housing occupied by persons receiving rental assistance under chapter 138a or Section 1437f of Title 42 of the United States Code; (4) 'commission' means a zoning commission, planning commission, planning and zoning commission, zoning board of appeals or municipal agency exercising zoning or planning authority; and (5) 'municipality' means any town, city or borough, whether consolidated or unconsolidated.

"(b) Any person whose affordable housing application is denied or is approved with restrictions which have a substantial adverse impact on the

the defendant's denial of its application. The trial court sustained the plaintiff's appeal, reversed the defendant's decision and granted the plaintiff's application.

viability of the affordable housing development or the degree of affordability of the affordable dwelling units, specified in subparagraph (B) of subdivision (1) of subsection (a) of this section, contained in the affordable housing development, may appeal such decision pursuant to the procedures of this section. Such appeal shall be filed within the time period for filing appeals as set forth in sections 8-8, 8-9, 8-28, 8-30, or 8-30a, as applicable, and shall be made returnable to the superior court for the judicial district of Hartford-New Britain. Affordable housing appeals shall be heard by a judge assigned by the chief court administrator to hear such appeals. To the extent practicable, efforts shall be made to assign such cases to a small number of judges so that a consistent body of expertise can be developed. Appeals taken pursuant to this subsection shall be privileged cases to be heard by the court as soon after the return day as is practicable. Except as otherwise provided in this section, appeals involving an affordable housing application shall proceed in conformance with the provisions of said sections 8-8, 8-9, 8-28, 8-30, or 8-30a, as applicable.

"(c) Upon an appeal taken under subsection (b) of this section, the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission that (1) the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record; (2) the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; (3) such public interests clearly outweigh the need for affordable housing; and (4) such public interests cannot be protected by reasonable changes to the affordable housing development. If the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence in the record before it.

"(d) Following a decision by a commission to reject an affordable housing application or to approve an application with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units, the applicant may, within the period for filing an appeal of such decision, submit to the commission a proposed modification of its proposal responding to some or all of the objections or restrictions articulated by the commission, which shall be treated as an amendment to the original proposal. The filing of such a proposed modification shall stay the period for filing an appeal from the decision of the commission on the original application. The commission may hold a public hearing and shall render a decision on the proposed modification within forty-five days of the receipt of such proposed modification. The commission shall issue notice of its decision as pro-

Thereafter, the defendant petitioned the Appellate
Court for certification to appeal.[3] After the Appellate

vided by law. Failure of the commission to render a decision within said
forty-five days shall constitute a rejection of the proposed modification.
Within the time period for filing an appeal on the proposed modification
as set forth in sections 8-8, 8-9, 8-28, 8-30, or 8-30a, as applicable, the appli-
cant may appeal the commission's decision on the original application and
the proposed modification in the manner set forth in this section. Nothing
in this subsection shall be construed to limit the right of an applicant to
appeal the original decision of the commission in the manner set forth in
this section without submitting a proposed modification or to limit the issues
which may be raised in any appeal under this section.

"(e) Nothing in this section shall be deemed to preclude any right of appeal
under the provisions of sections 8-8, 8-9, 8-28, 8-30, or 8-30a.

"(f) Notwithstanding the provisions of subsections (a) to (e), inclusive,
of this section, the affordable housing appeals procedure established under
this section shall not be available if the real property which is the subject
of the application is located in a municipality in which at least ten per cent
of all dwelling units in the municipality are (1) assisted housing or
(2) currently financed by Connecticut Housing Finance Authority mortgages
or (3) subject to deeds containing covenants or restrictions which require
that such dwelling units be sold or rented at, or below, prices which will
preserve the units as affordable housing, as defined in section 8-39a, for
persons and families whose income is less than or equal to eighty per cent
of the area median income. The commissioner of housing shall, pursuant
to regulations adopted under the provisions of chapter 54, promulgate a
list of municipalities which satisfy the criteria contained in this subsection
and shall update such list not less than annually.

"(g) Notwithstanding the provisions of subsections (a) to (e), inclusive,
of this section, the affordable housing appeals procedure shall not be appli-
cable to an affordable housing application filed with a commission during
the one-year period after a certification of affordable housing project com-
pletion issued by the commissioner of housing is published in the Connecti-
cut Law Journal. The commissioner of housing shall issue a certification
of affordable housing project completion for the purposes of this subsec-
tion upon finding that (1) the municipality has completed an initial eligible
housing development or developments pursuant to section 8-336f or sec-
tions 8-386 and 8-387 which create affordable dwelling units equal to at
least one per cent of all dwelling units in the municipality and (2) the munic-
ipality is actively involved in the Connecticut housing partnership program
or the regional fair housing compact pilot program under said sections. The
affordable housing appeals procedure shall be applicable to affordable hous-
ing applications filed with a commission after such one-year period, except
as otherwise provided in subsection (f) of this section."

[3] General Statutes § 8-8 (o) provides: "There shall be no right to further
review except to the appellate court by certification for review, on the vote

Court granted the petition, we transferred the appeal to this court pursuant to Practice Book § 4023 and General Statutes § 51-199 (c). We affirm the judgment of the trial court.

The following facts are relevant to this appeal. The plaintiff is a private nonprofit organization composed of individuals from the West Hartford community and eleven local churches and synagogues, created for the purpose of " 'provid[ing] entry level home ownership opportunities for individuals and families of low and moderate income.' " At all material times, the plaintiff held an option to purchase approximately one and one-fourth acres of undeveloped property at 2561 Albany Avenue, West Hartford.[4] On May 6, 1991, pursuant to § 8-30g, the plaintiff submitted an application to the defendant requesting for the property: (1) a zone change from an R-13 single-family zone to an RM-4 multifamily zone;[5] and (2) a special development district designation.[6] The application, designed to meet the affordability requirements of § 8-30g for an "affordable housing development," sought approval for ten affordable housing units in three buildings on the property.[7]

On June 17 and June 27, 1991, the defendant held a public hearing on the plaintiff's application. At the

---

of two judges of the appellate court so to certify and under such other rules as the judges of the appellate court establish. The procedure on appeal to the appellate court shall, except as otherwise provided herein, be in accordance with the procedures provided by rule of law for the appeal of judgments rendered by the superior court unless modified by rule of the judges of the appellate court."

[4] After taking this appeal the plaintiff purchased the subject property.

[5] The R-13 single-family zone requires 12,750 square feet of lot area per dwelling unit while the RM-4 multifamily zone requires 4000 square feet of lot area per dwelling unit.

[6] Hereinafter, we will refer collectively to the requested zone change and special development district designation as the "application."

[7] The application proposed two four-unit buildings of 5000 square feet and one two-unit building of 2000 square feet.

two-day hearing, the West Hartford town planner, a representative of the Northwest Homeowner's Association and several members of the public testified in opposition to the application. The plaintiff's executive director, its counsel, a local real estate appraiser, the president of the League of Women Voters and several members of the public, among others, testified in support of the application. In total, an equal number of people, approximately twenty-six, spoke both for and against the application.[8]

Following the conclusion of the hearing, at an August 6, 1991 meeting, the defendant voted unanimously to deny the plaintiff's application. In a letter dated August 8, 1991, the defendant informed the plaintiff of its decision. Although the deliberations concerning the application, reflected in the minutes of the defendant's August 6 meeting, revealed various concerns relating to the plaintiff's application, the letter failed to state any reasons for the defendant's decision.[9]

On August 30, 1991, the plaintiff appealed to the Superior Court from the defendant's decision to deny its application. During the pendency of the appeal, the defendant filed a motion to dismiss, claiming that the proposed project was neither "assisted" nor deed restricted and, accordingly, did not constitute an "affordable housing development" as defined in § 8-30g (a) (1) (A) and (B). After receiving testimony and hearing oral argument on June 10, 1992, the trial court denied the defendant's motion.

---

[8] Additionally, the record is replete with letters and petitions, mostly in opposition to the proposal.

[9] The body of the letter, addressed to the plaintiff's counsel, provided in relevant part: "The Town Council at its meeting on August 6th unanimously denied the petition for zone change and special development district designation for property at 2561 Albany Avenue, application by the West Hartford Interfaith Coalition, Inc., to permit construction of ten cooperative housing units."

Subsequently, after an evidentiary hearing, the trial court sustained the plaintiff's appeal and granted the plaintiff's application. The defendant has appealed, raising five issues. On appeal, the defendant claims that the trial court improperly: (1) implicitly concluded that the affordable housing land use appeals procedure set forth in § 8-30g applies to legislative zone changes; (2) failed to apply traditional concepts of zoning review to the plaintiff's affordable housing appeal; (3) failed to consider the affordability of all housing in West Hartford in assessing the need for "affordable housing" under § 8-30g (c); (4) failed to require the plaintiff to establish a likelihood that it would succeed in providing affordable housing; and (5) ordered a zone change and approval of the special development district designation in lieu of remanding the plaintiff's application to the defendant. Additional facts will be set forth hereinafter where relevant.

I

The defendant first claims that the trial court improperly concluded, by implication, that the procedure governing the affordable housing land use appeals set forth in § 8-30g applied to the defendant's legislative decision[10] to deny the plaintiff's requested zone change.

[10] In voting to deny the plaintiff's requested zone change of the subject property, the defendant exercised a legislative function; *DeMeo* v. *Zoning Commission*, 148 Conn. 68, 75, 167 A.2d 454 (1961); *Burke* v. *Board of Representatives*, 148 Conn. 33, 38, 166 A.2d 849 (1961); *Kutcher* v. *Town Planning Commission*, 138 Conn. 705, 709, 88 A.2d 538 (1952); as distinguished from an administrative one. *Rules Committee of the Superior Court* v. *Freedom of Information Commission*, 192 Conn. 234, 239, 472 A.2d 9 (1984); *Parks* v. *Planning & Zoning Commission*, 178 Conn. 657, 660, 425 A.2d 100 (1979). Acting in such a legislative capacity, the defendant has "wide and liberal" discretion; *Burnham* v. *Planning & Zoning Commission*, 189 Conn. 261, 266, 455 A.2d 339 (1983); and "is free to amend its regulations whenever time, experience, and responsible planning for contemporary or future conditions reasonably indicate the need for a change." (Internal quotation marks omitted.) *Parks* v. *Planning & Zoning Commission*, supra. In contrast, when acting in an administrative capacity, a zoning commis-

The defendant asserts that the plaintiff's application requested two distinct but interdependent actions: first, the plaintiff requested a zone change on the subject property from single-family to multifamily; and second, in the event that the defendant granted the zone change, the plaintiff requested approval of a special development district designation (special designation), which included, inter alia, requests for waivers of certain standards in the underlying zone change solicited by the plaintiff. The defendant further asserts that, under § 177-44.A of the West Hartford Code of Ordinances, a special designation may be granted *only if* the request pertains to "permitted uses of land in the zoning district in which it is located." The defendant contends that when the plaintiff applied for the special designation, its proposed multifamily residential use for the subject property was *not* permitted in the underlying single-family zone. Thus, the defendant asserts, approval of the plaintiff's request for a special designation would have required prior approval of the plaintiff's requested multifamily zone change.

In light of these factors, the defendant contends that § 8-30g does not apply to the plaintiff's first and separate request for a zone change on the subject property because such a request is not "in connection with" the plaintiff's affordable housing development application, as required by § 8-30g (a) (2).[11] In response, the plaintiff asserts, inter alia, that the defendant never raised the issue of the applicability of § 8-30g to legislative

sion's more limited function is "to determine whether the applicant's proposed use is one which satisfies the standards set forth in the regulations and the statutes." *Goldberg* v. *Zoning Commission,* 173 Conn. 23, 29, 376 A.2d 385 (1977), superseded by statute as stated in *TLC Development, Inc.* v. *Planning & Zoning Commission,* 215 Conn. 527, 577 A.2d 288 (1990), overruled by *Friedman* v. *Planning & Zoning Commission,* 222 Conn. 262, 608 A.2d 1178 (1992); *Armstrong* v. *Zoning Board of Appeals,* 158 Conn. 158, 168–69, 257 A.2d 799 (1969).

[11] See General Statutes § 8-30g (a) (2), footnote 2.

decisions at any point prior to seeking this appeal; consequently, the plaintiff argues that this court should not now consider the claim.

Although our examination of the record confirms that the defendant did not raise this claim below,[12] the record that is before us regarding the claim is nevertheless adequate for our review. In view of the adequate record, the public character of this case and the significance of the issue to both the parties and the surrounding community, we elect to invoke, pursuant to Practice Book § 4183, our general power of supervision and control over proceedings on appeal. *Matza* v. *Matza*, 226 Conn. 166, 189, 627 A.2d 414 (1993); *Pisel* v. *Stamford Hospital*, 180 Conn. 314, 330, 430 A.2d 1 (1980); *Silverman* v. *St. Joseph's Hospital*, 168 Conn. 160, 171, 363 A.2d 22 (1975). Pursuant to this power, we will address the defendant's claim that the trial court improperly concluded by implication that § 8-30g applies to legislative zone changes and hold that the trial court's implicit application of the statute to the defendant's decision to deny the plaintiff's application was proper.

"Ordinarily, the construction and interpretation of a statute is a question of law for the courts . . . particularly where, as here, the statute has not previously been subjected to judicial scrutiny or time-tested agency interpretations." (Internal quotation marks omitted.) *Jutkowitz* v. *Department of Health Services*, 220 Conn. 86, 106, 596 A.2d 374 (1991). "In construing a statute, we seek to ascertain and give effect to the apparent intent of the legislature." (Internal quotation marks omitted.) *Vaillancourt* v. *New Britain Machine/Litton*, 224 Conn. 382, 390, 618 A.2d 1340 (1993). "In seeking to discern that intent, we look to the words of the

[12] The defendant did not raise the claim during the hearing on the plaintiff's application or in its answer on appeal. Likewise, the defendant did not raise the argument in its two pretrial briefs or in its motion to dismiss.

statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to implement, and to its relationship to existing legislation . . . ." (Internal quotation marks omitted.) *State* v. *McVeigh,* 224 Conn. 593, 607, 620 A.2d 133 (1993).

In construing § 8-30g, we must start with the language employed by the legislature. *United Illuminating Co.* v. *Groppo,* 220 Conn. 749, 756, 601 A.2d 1005 (1992). Generally, "when the language of a statute is plain and unambiguous, we need look no further than the words themselves because we assume that the language expresses the legislature's intent." *American Universal Ins. Co.* v. *DelGreco,* 205 Conn. 178, 193, 530 A.2d 171 (1987). Further, we must interpret a statute according to its plain and ordinary meaning. *Mazur* v. *Blum,* 184 Conn. 116, 118, 441 A.2d 65 (1981). "When the language of a statute is unclear, [however,] we may ascertain the intent of the legislature by looking beyond the language to the statute's legislative history and the purpose that the statute was intended to serve." *Weinberg* v. *ARA Vending Co.,* 223 Conn. 336, 341, 612 A.2d 1203 (1992). "A statute . . . should not be interpreted to thwart its purpose." (Internal quotation marks omitted.) *Board of Education* v. *State Board of Labor Relations,* 217 Conn. 110, 126–27, 584 A.2d 1172 (1991).

Applying these principles to our interpretation of § 8-30g, we conclude that the legislature intended the statute's appeals procedure to apply to the defendant's legislative decision to grant or deny a zone change. The plain and unambiguous language of § 8-30g supports this conclusion. Section 8-30g (a) (2) defines an "affordable housing application" as "*any* application made to a commission *in connection with* an affordable housing development by a person who proposes to develop such affordable housing." (Emphasis added.) Apart from requiring that an application be made in connec-

tion with an affordable housing development proposal, the statute contains no exceptions or qualifications limiting the definition of an affordable housing application to certain types of applications to zoning commissions. In contrast, the statute modifies "application" with the word "any." In the absence of a single qualification limiting the definition of "affordable housing application," and in view of the "plain and ordinary" meaning of the word "any," we construe the language of § 8-30g to apply to every type of application filed with a commission in connection with an affordable housing proposal.[13]

The circumstances surrounding the statute's enactment and its legislative history further support our conclusion that the legislature intended § 8-30g to apply to legislative zone changes. First, the report of the "Blue Ribbon Commission on Housing," which originally proposed the affordable housing appeals procedure in its 1989 final report to Governor William A. O'Neill and the General Assembly,[14] reveals that the proposed appeals procedure contemplated zone changes. In proposing this procedure, the commission described the need to increase density allowances and to circumvent prohibitively costly zoning and subdivision requirements: "Expanding the basis for an appeal gives would-be developers of affordable housing an

---

[13] As the amici curiae point out in their brief, the legislature's intent to cover zone changes is reinforced by the explicit designation of two specific exceptions to the statute, one in General Statutes § 8-30g (f) (towns with greater than 10 percent government assisted or deed restricted housing) and the other in § 8-30g (g) (towns that have been temporarily certified as active participants in the Connecticut housing partnership program). In contrast to these specific exceptions, the applicability of the statute to *any* application is without qualification. Thus, there is a strong argument that had the legislature so desired, it would have explicitly excepted zone changes from the statute.

[14] The report was officially entitled "State of Connecticut Blue Ribbon Commission on Housing Report and Recommendations to the Governor and General Assembly, February 1, 1989."

opportunity *to contrast specific zoning and low-density regulations or anti-growth practices,* when encountered, with a community's need for affordable housing." (Emphasis added.) State of Connecticut Blue Ribbon Commission on Housing Report and Recommendations to the Governor and General Assembly, February 1, 1989, p. 12. During the floor debate in the Senate concerning § 8-30g, Senator Richard Blumenthal stated that the affordable housing appeals bill (i.e., § 8-30g) "[was] important because it really is the centerpiece of the series of recommendations that emerged from the Governor's Blue Ribbon Commission on Housing." 32 S. Proc., Pt. 12, 1989 Sess., p. 4048. Thus, to the extent that the commission's recommendations served as a basis for § 8-30g, the commission's report is illustrative of the legislature's intent. Cf. *Mahoney* v. *Lensink,* 213 Conn. 548, 559–62, 569 A.2d 518 (1990).

In addition, during the floor debate in the House of Representatives, various legislators explicitly discussed the applicability of the appeals procedure contained in § 8-30g to legislative decisions, and in particular to zone change applications. At least one legislator voiced opposition to § 8-30g on the basis of the statute's applicability to zone changes. 32 H.R. Proc., Pt. 30, 1989 Sess., p. 10,630, remarks of Representative James Fleming. Of special significance is the response of Representative William Cibes to a question from Representative Robert Farr about a proposal to develop multifamily housing in a single-family zone, and whether such a proposed change in the underlying zone would be "in itself a basis for denial." Representative Cibes stated: "[T]he answer is no, not per se. The municipality might have very good grounds for not having multifamily dwellings in the particular area. The soil type, the capacity of the infrastructure, various reasons such as that might have been a reason for the municipality not to adopt a particular zone for that particular area, but per

se, there would not—it would not [be] a reason for rejecting this application." 32 H.R. Proc., Pt. 30, 1989 Sess., pp. 10,608–10,609.

Finally, our interpretation of § 8-30g as encompassing legislative zone changes promotes the legislative policy that the statute was designed to implement. In contrast, the defendant's proposed reading of the statute would " 'thwart its purpose.' " *Board of Education* v. *State Board of Labor Relations,* supra, 126–27. Our review of the statute's legislative history reveals that the key purpose of § 8-30g is to encourage and facilitate the much needed development of affordable housing throughout the state. See, e.g., 32 S. Proc., Pt. 12, 1989 Sess., p. 4051, remarks of Senator Fred Lovegrove, and p. 4058, remarks of Senator Kevin Sullivan. The defendant's proposed interpretation of the statute would undermine this very important objective. Under the defendant's proposed interpretation, a town could utilize zoning to impede a developer from appealing under the statute. That is, a town could remove itself entirely from § 8-30g by eliminating any zones appropriate for the development of affordable housing. Conceivably, towns in which no land is zoned for multifamily housing would be wholly exempt from the statute.[15] We refuse to construe § 8-30g to include an implied limitation that would be so antithetical to the intent of the legislature.

In summary, on the basis of the plain language of § 8-30g and its legislative history, the circumstances surrounding its enactment, and the purpose for which it was designed, we conclude that the legislature

---

[15] The remarks of Senator Margaret Morton during the floor debates specifically addressed this concern: "I know towns in this small state . . . that have actually zoned out the possibility of their parents or their children being able to afford a home in the town that they have lived in all their lives. We should be very careful [to prevent this] and I urge support of this bill." 32 S. Proc., Pt. 12, 1989 Sess., p. 4073.

intended the statute to apply to legislative zone changes. Accordingly, we hold that the trial court properly applied § 8-30g to the plaintiff's appeal from the defendant's decision to deny the requested zone change.

## II

As a corollary to its prior claim, the defendant next claims that, even if § 8-30g properly applies to legislative zone changes, the trial court should have applied traditional concepts of judicial review of zoning commission decisions to the plaintiff's affordable housing appeal. The defendant argues that the trial court failed to do so in several respects. First, the defendant asserts that the trial court required the defendant collectively to state its reasons for denying the plaintiff's application and refused to search the record for reasons in support of the defendant's decision. Second, the defendant contends that the trial court substituted its judgment for that of the defendant regarding the density of the site. Finally, the defendant asserts that the trial court both ignored the defendant's collective vote that the plaintiff's plan was in disharmony with West Hartford's comprehensive plan and overlooked the defendant's right to rely on its personal knowledge of the site and its environs. Our review of the trial court's memorandum of decision persuades us that the trial court properly applied traditional concepts of judicial review, where appropriate, to its review of the defendant's decision. Consequently, we reject the defendant's claims.

As a prelude to a discussion of the merits of the defendant's arguments, we reiterate the well established concepts that govern judicial review of zoning commission decisions. The defendant, in denying the plaintiff's application, was acting in its legislative capacity.[16] When such a denial is appealed, "it is not the func-

---

[16] See footnote 10.

tion of the court to retry the case. Conclusions reached by [a zoning] commission must be upheld by the trial court if they are reasonably supported by the record. The credibility of the witnesses and the determination of issues of fact are matters solely within the province of the [commission]. . . . The question is not whether the trial court would have reached the same conclusion, but whether the record before the [commission] supports the decision reached. (Citations omitted.) *Calandro* v. *Zoning Commission,* 176 Conn. 439, 440, 408 A.2d 229 (1979).

"Where a zoning [commission] has stated its reasons for its actions, the court should determine only whether the assigned grounds are reasonably supported by the record and whether they are pertinent to the considerations which the authority was required to apply under the zoning regulations. . . . The zone change must be sustained if even one of the stated reasons is sufficient to support it. . . . The principle that a court should confine its review to the reasons given by a zoning [commission] does not apply to any utterances, however incomplete, by the members of the [commission] subsequent to their vote. [Rather, it] applies where the [commission] has rendered a formal, official, collective statement of reasons for its action." (Citations omitted; internal quotation marks omitted.) *Protect Hamden/North Haven from Excessive Traffic & Pollution, Inc.* v. *Planning & Zoning Commission,* 220 Conn. 527, 544, 600 A.2d 757 (1991). Thus, "where a zoning commission has formally stated the reasons for its decision, the court should not go behind that official collective statement . . . [and] attempt to search out and speculate upon other reasons which might have influenced some or all of the members of the commission to reach the commission's final collective decision." *DeMaria* v. *Planning & Zoning Commission,* 159 Conn. 534, 541, 271 A.2d 105 (1970).

Where, however, the zoning commission fails to present a formal collective statement of reasons the court must "search the entire record to find a basis for the commission's decision . . . ." *Parks* v. *Planning & Zoning Commission,* 178 Conn. 657, 662, 425 A.2d 100 (1979). In such a case, individual reasons "given by certain members of the commission [do] not amount to a formal, collective, official statement of the commission"; *Protect Hamden/North Haven from Excessive Traffic & Pollution, Inc.* v. *Planning & Zoning Commission,* supra, 545; and "are not available to show the reason[s] for, or the ground[s] of, the [commission's] decision." *Welch* v. *Zoning Board of Appeals,* 158 Conn. 208, 214, 257 A.2d 795 (1969).

With these concepts of judicial review in mind, we address the defendant's arguments seriatim.

A

The defendant's claim that the trial court required the defendant collectively to state its reasons and refused to search the record is wholly without merit. In its memorandum of decision, the trial court never required the defendant collectively to state its reasons. Rather, the trial court merely noted that the defendant's failure "collectively [to] express its reasons for the denial" was a "disfavored" procedure. Moreover, the trial court stated: "A review of [§ 8-30g (c)] indicates that the legislature has now placed the burden of proof on the commission . . . and not, *as in traditional land use appeals,* on the applicant. *Like a traditional appeal, however,* the evidence is to be *gleaned from the record;* the new process is not a trial de novo." (Emphasis added.)

Further, the trial court correctly stated: "[W]here a zoning commission has formally stated the reasons for its decision, the court should not go behind that official collective statement of the commission. It should

not attempt to search out and speculate upon other reasons which might have influenced some or all of the members of the commission to reach the commission's final collective decision. . . . The reviewing court ought only to determine whether the assigned grounds are reasonably supported by the record and whether they are pertinent to the considerations which the authority was required to apply under the zoning regulations. . . . Of course, where there is a failure to comply with the obligation to state reasons, the action is not deemed void but the court must search the record to see whether the board was justified in its decision." (Citations omitted; internal quotation marks omitted.)

Thereafter, the trial court stated that "[i]n the present case, the Council members did not give a formal collective statement for the denial." Rather, members stated individual reasons, reflected in the minutes of the hearing, prior to voting. Citing *Welch* v. *Zoning Board of Appeals,* supra, 214, the trial court correctly recognized that "these individual views [were] not available to show the reasons for, or the grounds of, the board's decision."

Subsequently, the trial court applied the traditional standard of review applicable to zoning commission decisions, and, in the absence of any formal collective statement by the defendant for denying the plaintiff's application, thoroughly searched the entire record to see whether the defendant was justified in its decision. *Parks* v. *Planning & Zoning Commission,* supra, 661–62. In searching the record of the minutes of the August 6, 1991 meeting, the trial court found expressions of two primary concerns about the plaintiff's proposed development: its size and density. The trial court concluded, however, that, even if it is assumed that size and density problems met the requirements of § 8-30g (c) (1) and (2), there was no evidence that those problems "clearly outweigh[ed] the need for afforda-

ble housing" as required by § 8-30g (c) (3). Consequently, the trial court found that the defendant had failed to satisfy its burden of proof under § 8-30g (c).[17]

In light of the foregoing, we conclude that, contrary to the defendant's assertion, the trial court did not require the defendant collectively to state its reasons for denial,[18] and, in fact, properly searched the entire record to find a basis for the defendant's decision.

## B

We also conclude that the trial court did not substitute its judgment for that of the defendant regarding the density of the site. In its memorandum of decision, the trial court acknowledged and closely analyzed the defendant's concerns relating to the size, number and proposed height of the units. The trial court, however, determined that under the burden-shifting mechanism of § 8-30g (c) such concerns were clearly outweighed by the need for affordable housing. The trial court noted that all the existing multifamily areas on the other three sides of the subject property were "more intensely developed." Specifically, the court noted that the den-

---

[17] In addition to size and density, the trial court found nine other "reasons for [the defendant's] denial" of the plaintiff's application: the project's sight line; concern about spot zoning; the desire to utilize other property; concern about the placement of the buildings; concern that the project violated the town plan of development; concern over the lack of sidewalks; concern over the lack of green space; and concern over the precedential effect of the project's approval. The trial court correctly noted, however, that pursuant to *Welch* v. *Zoning Board of Appeals,* 158 Conn. 208, 214, 257 A.2d 795 (1969), "none of these individual reasons [were] available to show the grounds for the [defendant's] decision." The trial court further stated, that, even if the reasons had constituted a formal collective statement, the defendant had failed to meet its burden under § 8-30g (c) by proving that any one of the individual reasons outweighed the need for affordable housing.

[18] Because we determine that the trial court did not conclude that General Statutes § 8-30g requires the defendant collectively to state its reasons for its decision, we leave for another day the issue of whether the statute compels the defendant to do so.

sity of the "Hartmeadow project is . . . 'slightly lower than what is asked for by [the plaintiff]' " and that the "Brace-Dale project, previously approved, has a greater density (but fewer units)." Additionally, the trial court stated that the proposed lot coverage of 12 percent not only met the existing R-13 single-family zone standards on the subject property—allowing up to 30 percent coverage—but also met the proposed RM-4 multifamily zone standards of 20 percent coverage. Accordingly, the trial court concluded: "The [defendant had] simply not met its burden of proving that the size of th[e] project, the ten units or, the increase of six units over the allowable four units, outweigh[ed] the need for this approval." In light of the trial court's foregoing analysis, we conclude that it did not substitute its judgment for that of the defendant concerning the density of the site.

## C

Finally, we conclude that the trial court neither ignored the defendant's collective "no" vote on its motion to grant the plaintiff's application[19] nor overlooked the defendant's right to rely on its personal knowledge of the site and its environs in casting that vote. The defendant's "collective vote" essentially constituted its *decision* to deny the plaintiff's application. The defendant's argument, claiming that its vote was ignored and its knowledge overlooked, therefore, merely reiterates its claim that the trial court failed properly to search the record to find a basis for its decision. Because we already have concluded that the trial

---

[19] The defendant's motion, stated by Town Council Vice President Larry Price, was as follows: "I move that we adopt the change in zone from R-13 to RM-4 and apply a special development district for property at 2561 Albany Avenue and find that the plan is in harmony with the overall objective of the comprehensive plan, superior to a plan possible under regular standards and in harmony with the actual and permitted development of adjacent properties."

court in fact searched the record and was unable to find a basis to justify the defendant's decision, we reject its argument.

We agree with the defendant that its wide discretion in denying the plaintiff's request for a zone change encompasses the ability to rely on its personal knowledge of the site and its environs as a basis for its vote. *Stiles* v. *Town Council,* 159 Conn. 212, 218–19, 268 A.2d 395 (1970) (courts allow a zoning authority "wide and liberal discretion . . . in determining the public need and the means of meeting it, because the local authority lives close to the circumstances and conditions which create the problem and shape the solution"). The only personal knowledge to which the defendant directs this court's attention, however, is an awareness on the part of the defendant's members of various "affordable housing initiatives and opportunities [existing] in West Hartford." Because we conclude in our discussion of the defendant's fourth claim, infra, that such initiatives and opportunities do not satisfy the statutory requirements of "affordable housing," the defendant's consideration of these factors could not furnish a proper basis to justify its decision. Accordingly, we reject the defendant's argument and conclude that the trial court properly applied traditional concepts of zoning review when it reversed the defendant's decision.

## III

The defendant's next claim is that the trial court improperly refused to consider the affordability of all housing in West Hartford when it assessed the need for "affordable housing" under § 8-30g (c). In an affordable housing appeal, § 8-30g (c) requires a zoning commission to prove, inter alia, that (1) "the [zoning commission's] decision is necessary to protect substantial public interests in health, safety, or other matters which

the commission may legally consider"; and (2) "such public interests clearly outweigh the need for affordable housing." General Statutes § 8-30g (c) (2) and (3). Additionally, as we have already discussed, § 8-30g (a) (1) limits the definition of "affordable housing" either to "assisted" housing or to deed restricted housing.

In support of its reversal of the defendant's denial of the plaintiff's application, the trial court determined that West Hartford was not exempt from the statute pursuant to § 8-30g (f) or (g) and that substantial public interests[20] did not clearly outweigh the need for affordable housing. As previously stated, the trial court found that the defendant had advanced two primary concerns as justifications for denying the plaintiff's application—the size and density of the proposed project. Against these concerns, the trial court weighed the need for affordable housing and concluded that the need outweighed the defendant's concerns.

In evaluating "need," the trial court ruled that the only affordable housing units that could be considered were units that met the statutory definition of affordable housing.[21] Further, relying on the Blue Ribbon Commission's report on the regional assessment of the state's housing needs, the trial court concluded that the

[20] The trial court never explicitly found that the defendant's decision to deny the plaintiff's application was "necessary to protect the public interests in health, safety, or other matters which the commission may legally consider." It is, however, implicit in its progression to the third prong of the statute to reach the balancing required for General Statutes § 8-30g (c) (3), that the trial court first determined that the defendant's stated concerns about size and density comprised substantial public interests, in satisfaction of § 8-30g (c) (2).

[21] In August, 1991, the month the defendant acted on the instant application, West Hartford had approximately 1500 housing units that met the statutory definition of affordable housing, comprising approximately 6 percent of the total housing units in the town.

state was deficient by 181,535 units and that the capital area was deficient by 35,145 units, resulting in an overall regional deficiency of 12.89 percent.

The defendant argues that under § 8-30g (c), when weighing the need for affordable housing in West Hartford against the substantial public interests advanced by the defendant as reasons for denying the plaintiff's application, the trial court should have considered evidence of existing housing that did not meet the statutory definition of "affordable housing" but was, nevertheless, "affordable." In particular, the defendant argues that the trial court should have considered statistical evidence demonstrating that at the time of the plaintiff's hearing before the defendant, there were at least sixty residential units listed on the market in West Hartford for less than $147,500 and thirty-seven housing units listed with an asking price below $99,000. Additionally, the defendant argues that the trial court should have considered evidence that the defendant's membership had personal knowledge of various efforts on the part of West Hartford to promote affordable housing in the town.[22] We disagree.

As the amici curiae point out in their brief, there is no support in the statute or its legislative history for the defendant's position. Section 8-30g (a) explicitly limits the definition of "affordable housing" to "assisted housing" or deed restricted housing. Further, § 8-30g (f) and (g) provide specific exemptions from the

---

[22] The efforts to which the defendant points include: (1) the allocation of community development block grant funds to assist in the rehabilitation of affordable houses; (2) the provision of funds for conversion of two-family to three-family homes with long-term affordability constraints; (3) the development of a housing trust fund and zoning ordinance amendments initiated by the West Hartford Housing Partnership; (4) the development of a sizeable, affordable housing project on West Hartford town property; (4) general initiatives of the West Hartford Housing Authority; and (5) the approval of a zone change in the Brace-Dale Road area for another affordable housing project proposed by the plaintiff.

statute's appeals procedure. Because the "evidence" proffered by the defendant does not comport with the statutory definition of "affordable housing," it satisfies neither statutory exemption. Consequently, when weighing the need for affordable housing, the trial court correctly refused to consider the defendant's evidence of low cost housing and of private efforts to encourage its development. We conclude, therefore, that the trial court properly determined that the defendant failed to prove, pursuant to § 8-30g (c), that substantial public interests outweighed the need for affordable housing in West Hartford.[23]

---

[23] As a corollary to its claim, the defendant also argues that by citing to the Blue Ribbon Commission's report the trial court ignored the specific affordable housing needs of West Hartford and improperly focused on "regional" and statewide figures in assessing that need. The defendant urges that the trial court should have assessed need on the basis of local figures. The defendant points to the legislative history of General Statutes § 8-30g as reflecting the legislative intent to abandon a regional focus; see 32 H.R. Proc., Pt. 30, 1989 Sess., p. 10574, remarks of Representative Richard Tulisano; and to "make very clear that it is the municipality's responsibility to care for the housing needs of its citizens and not some broader community." See 32 H.R. Proc., Pt. 30, 1989 Sess., p. 10623, remarks of Representative William Cibes. On the other hand, a local focus could severely undermine the development of low income housing because wealthy towns could claim that they have few low income residents, and consequently have little or no local need for low income housing. In addition, as the amicus brief points out, the defendant's proposed interpretation of the statute, requiring an empirical analysis of need limited to the particular locality, could undermine its effectiveness in the future by inviting litigation over an ancillary, complex factual issue.

We decline to reach this issue. The record, however, reveals, and the defendant does not dispute, that West Hartford at all material times had 1500 units of "affordable housing" under the governing statutory definition, reflecting only 6 percent of its total housing. This percentage falls far below the 10 percent figure needed for West Hartford to qualify under the statutory exemption of § 8-30g (f). Thus, sufficient evidence of local need existed in the record before the trial court to demonstrate a local deficiency of affordable housing upon which the trial court could have relied in balancing the need for affordable housing with the defendant's concerns over size and density. Accordingly, the trial court's reliance on regional figures did not affect the outcome of its decision. We therefore reject the defendant's argument and leave for another day the issue of whether, under

## IV

The defendant's next claim is that the trial court should have required the plaintiff to demonstrate not only an intention to provide affordable housing but also the likelihood that it had the practical ability to effectuate its proposal. The defendant derives this claim from the definitional requirements of § 8-30g (a). Section 8-30g (a) (1) defines "affordable housing development" as "a proposed housing development (A) which is *assisted housing* or (B) in which not less than twenty percent of the dwelling units will be conveyed by deeds containing covenants or restrictions which shall require that such dwelling units be sold or rented at, or below, prices which will preserve the units as affordable housing . . . ." (Emphasis added.) Thus, § 8-30g (a) (1) sets forth two alternate tests, under either of which an applicant can qualify for "affordable housing development" status under the statute. Further, § 8-30g (a) (3) defines "assisted housing" as "housing which is receiving, or will receive, financial assistance under any governmental program for the construction or substantial rehabilitation of low and moderate income housing, and any housing occupied by persons receiving . . . " certain state or federal rental assistance.

The trial court found that the plaintiff's proposal satisfied both tests under § 8-30g (a).[24] The defendant

§ 8-30g (c), the need for affordable housing should be assessed on a regional or local basis, or assessed generically in the manner that other balancing tests in our law have been analyzed. See, e.g., *Hudson* v. *Palmer,* 468 U.S. 517, 527, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984) (balancing society's interest in security of penal institutions against prisoner's interest in privacy within cell without actually undertaking a quantitative, empirical analysis of the respective interests).

[24] Because General Statutes § 8-30g (a) (1) is written in the disjunctive, we acknowledge that the plaintiff need have satisfied only one test. Because the trial court, however, conducted an analysis under both tests, we do the same.

contends, however, that in light of the above discussed definitions, the trial court should have required the plaintiff to demonstrate a greater likelihood that its proposed housing either (1) was receiving or would receive government financial assistance, or (2) would be deed restricted to ensure its affordability. Because the defendant's interpretation of "affordable housing development" reads into the statute a stricter standard than is mandated by the statute, we reject the defendant's argument.

The record reveals and the trial court properly concluded that the plaintiff's proposed housing development qualified as "assisted housing" under § 8-30g (a) (1). At the June 10, 1992 hearing on the defendant's motion to dismiss, the trial court received evidence that the plaintiff's proposed project already had received an $11,600 interest free loan from the department of housing, through the Connecticut Housing Investment Fund, Inc.[25] Moreover, the director of policy and planning at the department of housing testified that it was likely that the plaintiff's proposal would receive governmental financial assistance for construction. Finally, the plaintiff's original zoning application indicated that the plaintiff would be receiving additional governmental funds only upon receipt of approval for its requested zone change.

To satisfy the definition of "assisted housing," § 8-30g (a) (3) merely required the plaintiff to demonstrate that either it received or it would be receiving financial assistance under any governmental program for the construction of its affordable housing development. Because the evidence in the record supports the conclusion that the plaintiff already had received financial assistance from the department of housing through

[25] The evidence received by the trial court consisted of a letter from the Connecticut Housing Investment Fund, Inc., stating that the loan had been awarded to the plaintiff and a copy of the note for said sum.

the Connecticut Housing Investment Fund, Inc., and would be likely to receive more governmental assistance upon approval of its application, we conclude that the trial court properly determined that the plaintiff's application qualified as "assisted housing" under the § 8-30g.

Adoption of the more stringent standard advocated by the defendant would severely undermine the development of affordable housing. As noted above, the plaintiff indicated in its application that, although it was pursuing governmental assistance through the state department of housing, it was not possible to have final commitment for the funds prior to securing zoning approval. Thus, to require the plaintiff to furnish conclusive evidence of such funding approval prior to obtaining zoning authorization for purposes of determining whether a proposed affordable housing plan is "assisted" under § 8-30g would thwart the statute's purpose. Moreover, to have ensured that the appeal provisions of § 8-30g were not fraudulently utilized, the defendant could have conditioned approval of the plaintiff's application upon the receipt of the promised funds. West Hartford Code of Ordinances § 177-44.C (4) ("Town Council may attach any conditions to its approval [of a special development district plan] as it considers necessary in order to assure continued conformance to the approved plan and zoning regulations . . .").

The record also reveals and the trial court properly determined that the plaintiff's proposed housing units would be deed restricted within the definition of § 8-30g (a) (1) (B) so as to ensure their continued affordability. As evidence of its commitment to make all its proposed units affordable for the life of the units the plaintiff submitted to the trial court a copy of the Brace-Dale Association, Inc. Declaration of Cooperative. The plaintiff indicated its intent to use a similar declara-

tion, containing restrictions and covenants that run with the land, for its proposed affordable housing development. Specifically, the plaintiff's declaration will require that "[t]he Association shall not convey a unit to any would-be purchaser whose income exceeds 80% of the median income for the region as defined in the appropriate federal regulations." The declaration will further restrict membership to an applicant with "low to moderate income as defined in the State of Connecticut, Department of Housing and if that agency ceases to exist then by standards as determined by the United States Department of Housing and Urban Development . . . ." Finally, the declaration will ensure that both restrictions on alienation will be in force for at least twenty years.

The plaintiff's proposed affordable housing development will come under the provisions of the Common Interest Ownership Act (CIOA), General Statutes § 47-200 et seq., which provides in relevant part: " 'limited equity cooperative' means a cooperative whose declaration contains any restrictions on . . . the amount for which a unit may be sold . . . ." General Statutes § 47-242 (a). Under CIOA, the conveyance of a unit owner's interest in a cooperative is effectuated by delivery to the purchaser of the "instrument, *executed in the same manner as a deed,*" conveying the seller's interest in the unit. (Emphasis added.) General Statutes § 47-204 (e) (6). Thus, a limited equity affordable cooperative achieves the goals of a § 8-30g (a) (1) (B) deed restricted transfer even though the recorded document is not titled a "deed" per se. The trial court concluded that in view of the technical nature of the plaintiff's instrument of conveyance, this statutory requirement is a "distinction without a difference," and we agree. Consequently, we conclude that the trial court correctly determined that the plaintiff's proposed affordable housing units qualified as deed restricted under § 8-30g (a) (1) (B).

In summary, on the basis of the evidence in the record, we are satisfied that the trial court properly concluded that the plaintiff's proposal met the definitional requirements of § 8-30g (a).

V

The defendant's final claim is that the trial court improperly ordered a zone change and approval of the special development district designation in lieu of remanding the plaintiff's application to the defendant with the instruction that the plaintiff revise its application. We disagree.

Section 8-30g (c) provides in relevant part: "If the commission does not satisfy its burden of proof under this subsection, the court shall *wholly* or partly *revise,* modify, remand *or reverse* the decision from which the appeal was taken in a manner consistent with the evidence in the record before it." (Emphasis added.) Additionally, § 8-30g (d) provides: "Following a decision by a commission to reject an affordable housing application . . . the applicant *may,* within the period for filing an appeal of such decision, submit to the commission a proposed modification of its proposal responding to some or all of the objections or restrictions articulated by the commission, which shall be treated as an amendment to the original proposal. . . ." (Emphasis added.) The subsection further provides: "Nothing in this subsection shall be construed to limit the right of an applicant to appeal the original decision of the commission in the manner set forth in this section *without submitting a proposed modification* or to limit the issues which may be raised in any appeal under this section." (Emphasis added.)

In its memorandum of decision, the trial court held that § 8-30g (d) did not require the plaintiff to submit

a modification of its application to the defendant.[26] The trial court also held that the defendant failed to meet its burden of proof under § 8-30g (c), and, accordingly, reversed the defendant's decision and granted the plaintiff's application.

Both the trial court's determination that the plaintiff was not required to submit a modification and its remedy granting the application are specifically authorized by the plain language of § 8-30g. Section 8-30g (d) enables, but does not require the plaintiff to submit a modified application. Additionally, § 8-30g (c) permits the trial court "wholly or partly [to] revise" the defendant's decision on appeal. Notwithstanding this plain language, the defendant asks us to interpret § 8-30g to require the trial court to remand the plaintiff's application to the defendant with the instruction that the plaintiff modify its application. We decline so to rewrite § 8-30g (c) and (d) and, accordingly, conclude that the trial court properly reversed the defendant's decision and granted the plaintiff's application.[27]

The judgment is affirmed.

In this opinion PETERS, C. J., CALLAHAN and PALMER, Js., concurred.

---

[26] The trial court stated: "[General Statutes § 8-30g (d)] enables a developer who has had an application denied the opportunity to file an amended application . . . .

"There is no requirement that the applicant file that amended application and it was not done in this case. As the Council did not collectively state its reasons, it would be extremely difficult for this applicant to utilize the provisions of this section."

[27] The defendant also asserts that the trial court determined that it would be "futile" for the plaintiff to submit a revised application and claims that this determination is "not consistent with the evidence" in accordance with General Statutes § 8-30g (c). This argument, however, is wholly without merit. Contrary to what the defendant claims, the trial court's decision merely concluded that there was no requirement that the plaintiff submit a revised application to the defendant.

BERDON, J., concurring. In this case of first impression concerning General Statutes § 8-30g (Affordable Housing Act), I agree with the result reached and with most of the majority's analysis. I write separately only to discuss an issue that the majority concludes it is not required to reach—that is, how the "need for affordable housing" under § 8-30g (c) (3)[1] should be defined. Defining "need" is critical to determining whether the defendant town council of the town of West Hartford failed to prove that its identified public interests clearly outweigh the need for affordable housing.

I agree with the majority and the trial court that the size and density of the project proposed by the plaintiff, the West Hartford Interfaith Coalition, Inc., are the primary concerns that the defendant expressed in rejecting the project. I disagree, however, with the majority's conclusion in footnote 23 of its opinion that it is not necessary to define "need" in order to determine whether these concerns outweigh the need for affordable housing pursuant to § 8-30g (c) (3). The footnote states that it is unnecessary to define "need" because only 6 percent of West Hartford's housing is "affordable," and this is far below the 10 percent required for exemption from the requirements of the Affordable Housing Act under § 8-30g (f).[2] As a result,

[1] In this appeal under the Affordable Housing Act, the defendant town of West Hartford has the burden of proving that: "(1) the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record; (2) the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; (3) such public interests clearly outweigh the need for affordable housing; and (4) such public interests cannot be protected by reasonable changes to the affordable housing development." General Statutes § 8-30g (c).

[2] General Statutes § 8-30g (f) provides in relevant part: "[T]he affordable housing appeals procedure established under this section shall not be available if the real property which is the subject of the application is located in a municipality in which at least ten per cent of all dwelling units in the municipality are (1) assisted housing or (2) currently financed by Connect-

the majority concludes that the defendant did not sustain its burden of proof. There is nothing, however, in the language of the Affordable Housing Act or in its legislative history to suggest that the legislature intended that the 10 percent needed for exemption should be used as a measuring stick in determining whether the town's interests outweigh the need for affordable housing.[3] Indeed, the majority does not advance such a theory, but rather utilizes the 10 percent figure as a convenient means of avoiding the issue in this case.

I believe that the failure to define "need" will cause needless confusion. Furthermore, there are several important reasons why this court should define "need." As the majority opinion indicates, what constitutes need under § 8-30g (c) (3) was clearly raised by the parties. In addition, this issue is an important factor in determining whether the interests that a town advances are

icut Housing Finance Authority mortgages or (3) subject to deeds containing covenants or restrictions which require that such dwelling units be sold or rented at, or below, prices which will preserve the units as affordable housing, as defined in section 8-39a, for persons and families whose income is less than or equal to eighty per cent of the area median income. . . ."

[3] I also find the comparison confusing. As I understand it, the 1500 units of affordable housing (which is 6 percent of total housing) that West Hartford now has is affordable housing as defined by General Statutes § 8-30g (a) (1). See footnote 2 of the majority opinion. This figure, which does not include units that are financed by Connecticut Housing Finance Authority (CHFA) mortgages, is being compared with the 10 percent exemption provided in § 8-30g (f), which would include houses financed by CHFA. See footnote 2. Thus, in determining whether the public interests outweigh the need for affordable housing in this case, the majority compares apples with oranges. For all we know on the record before us, West Hartford may in fact meet the 10 percent requirement of § 8-30g (f) if CHFA loans are included.

Furthermore, it is for the trial court, at least in the first instance, to make the determination of whether the defendant has met its burden of proving that the public interests outweigh the need for affordable housing. In making this determination, the trial court did not equate "need" with the 10 percent required for exemption, but rather considered the generalized need for affordable housing on a statewide basis.

sufficient to defeat an affordable housing project. Because this issue is squarely before us, it is important that we reach it not only for this case, but also for all the other affordable housing projects that are or will be proposed. Our trial courts and local planning and zoning commissions need to know how to determine whether the public concerns asserted by a town are sufficient to reject an application. Finally, the confusion as to the meaning of "need" that exists among members of the bar; E. Lyons & M. Lyons, "Connecticut Crosses The Line: The Affordable Housing Appeals Act," 65 Conn. B.J. 281, 289 (1991); and legal scholars; 9 Connecticut Practice—Land Use Law and Practice (1993 R. Fuller) p. 834; underscores the need for a definition from this court.

The Affordable Housing Act was recommended to the legislature by the February 1, 1989 report of the legislatively created Blue Ribbon Commission on Housing[4] (commission report). The commission report concludes, on the basis of a survey,[5] that there is an enormous statewide deficiency of 181,535 affordable housing units. No one disputes this finding. The defendant argues, however, that, in reviewing the denial of the plaintiff's application, the trial court should have weighed West Hartford's *local* need for affordable housing against its public interests. Instead, the trial court weighed the public interests of the town against the need for affordable housing generally as established by the commission report. For the several reasons set forth below, I believe that in sustaining the plaintiff's appeal, the trial court correctly weighed the public interests of the town against the generalized need for affordable housing that exists statewide.

[4] See Public Acts 1987, No. 87-550, § 4 (a).

[5] In 1987, the state office of policy and management contracted with each of the state's fifteen regional planning agencies to conduct a regional housing needs assessment. These assessments were used to compile statewide figures.

The legislature could easily have added the necessary words "of the town" after "need" if it had intended that need was to be limited to the town's requirements for affordable housing. "If the legislature had really intended . . . this . . . we think it would have found a way to express that intent quite clearly." *Lee Bros. Furniture Co.* v. *Cram,* 63 Conn. 433, 439, 28 A. 540 (1893). "The intention of the legislature is found not in what it meant to say, but in the meaning of what it did say." *Colli* v. *Real Estate Commission,* 169 Conn. 445, 452, 364 A.2d 167 (1975). This generic use of the noun "need," without any qualification, was meant to encompass not just the need of the local community, but also the generalized need for affordable housing statewide.[6]

Furthermore, it is clear to me that because the legislature adopted the Affordable Housing Act in response to the commission's report, it took into consideration all the concerns, findings and conclusions of the commission. "Where . . . a report of a special commission or committee to the governor or General Assembly is presented to it, we consider it upon the assumption that its contents are generally known to the members of that body, at least in determining the general intent of the legislature." *State ex rel. Pettigrew* v. *Thompson,* 135 Conn. 228, 233–34, 63 A.2d 154 (1948). Surely,

[6] As the majority opinion correctly notes, there are suggestions in the floor debates that at least one legislator desired a localized focus on need. I realize that the debates of the legislators are relevant in determining legislative intent. *Hartford Electric Light Co.* v. *Wethersfield,* 165 Conn. 211, 223–24, 332 A.2d 83 (1973). "Nonetheless, we approach our attempt to glean the legislative intent from the floor debates with caution and circumspection because we recognize that legislative discussions may only be expressive of the views and motives of individual members and may not be a safe guide to views of the law-making body." *Robinson* v. *Unemployment Security Board of Review,* 181 Conn. 1, 9, 434 A.2d 293 (1980). In the present case, these suggestions that a local focus may have been intended are not controlling because such a construction would defeat the underlying purposes of the act.

shelter for those people across the state and within each region who are eligible for affordable housing was an important consideration. The commission pointed out that "[t]hroughout the period of our deliberations, the housing crisis continued to threaten the welfare of our citizens and the economic prosperity of our business community. We believe that, if the recommendations made by the Commission are adopted, great progress can be made in producing new affordable housing, preserving existing affordable housing, preventing homelessness, and planning land use strategies that benefit all our citizens." I agree with the majority that "a local focus could severely undermine the development of low income housing because wealthy towns could claim that they have few low income residents, and consequently have little or no local need for low income housing."

The commission's concerns, however, also extend to other matters that take on a statewide perspective and compel the conclusion that § 8-30g (c) (3) has reference to the need for affordable housing for *all* the people of Connecticut.[7] The commission recognized that the

---

[7] The facts that the legislature provided exemptions from the act if a town achieves certain affordable housing goals, and that the exemptions are uniform for every town, reinforce the conclusion that the act has a statewide focus. For example, a municipality is exempt from the provisions of the Affordable Housing Act for a period of one year after certification by the commissioner of housing that it has completed an initial eligible housing development pursuant to General Statutes § 8-386. General Statutes § 8-30g (g). Section 8-386 (a) provides as follows: "Upon submission of the initial report of the Blue Ribbon Commission on Housing pursuant to subsection (a) of section 4 of public act 87-550, the secretary of the office of policy and management, in consultation with the commissioner of housing, shall establish a pilot program in two planning regions of the state, as designated under the provisions of section 16a-4a, for the development, through the process of a negotiated investment strategy, *of a regional fair housing compact to provide increased housing for low and moderate income families within* the regions. The choice of the regions for such pilot program shall be based on the findings contained in the initial report of the Blue Ribbon Commission on Housing. The pilot program shall provide for

availability and location of affordable housing have an effect on racial and economic integration. After reviewing significant judicial decisions; e.g., *Huntington Branch, NAACP* v. *Huntington,* 844 F.2d 926 (2d Cir.), aff'd, 488 U.S. 15, 109 S. Ct. 276, 102 L. Ed. 2d 180 (1988), reh. denied, 488 U.S. 1023, 109 S. Ct. 824, 102 L. Ed. 2d 813 (1989); the commission expressed concern that "certain patterns of housing related land use regulatory decisions reflect (conscious or unconscious) patterns of economic and/or racial discrimination." If local housing requirements alone are to be considered in determining whether the public interests of a town outweigh the need for affordable housing, the beneficent goals of racial and economic integration through housing will be undermined. "In determining the true meaning of a statute when there is genuine uncertainty as to how it should apply, identifying the problem in society to which the legislature addressed itself by examining the legislative history of the statute under litigation is helpful." *State* v. *Campbell,* 180 Conn. 557, 562, 429 A.2d 960 (1980).

---

a series of negotiations to be conducted by a mediator with the secretary of the office of policy and management, or his designee, the commissioner of housing, or his designee, and the officers of the regional planning agency or agencies within the chosen regions, or their designees and a representative of each municipality within such planning regions, appointed by the chief executive officer of such municipality. *Such negotiations shall be conducted for the purpose of formulating and reaching consensus on a fair housing compact containing regional goals for the development of adequate, affordable housing based on the need for such housing in the regions as balanced against environmental, economic, transportation and infrastructure concerns, and the time frames for achieving such goals.* The secretary shall contract with an independent consultant to serve as mediator in such negotiations. Upon the successful negotiation of such regional fair housing compact, the terms of the compact shall be submitted to the regional planning agency or agencies for incorporation into the regional plan or plans of development, as provided under section 8-35a, and shall be transmitted to the chief executive officers of the municipalities located within the planning regions for approval by the municipalities. Such compact shall not be included in the regional plan or plans of development until sixty-five per cent of the legislative bodies located within the planning regions have given such approval." (Emphasis added.)

Finally, the expeditious processing of the applicants' appeals by the trial court was high on the legislature's agenda when it enacted the Affordable Housing Act. The legislature directed the judiciary as follows: "Appeals taken pursuant to [the Affordable Housing Act] shall be privileged cases to be heard by the court as soon after the return day as is practicable." General Statutes § 8-30g (b). Saddling the trial court with what could be a long, drawn out and complex evidentiary hearing to determine whether a particular town has a need for affordable housing at the time the application is filed would be counterproductive. For example, to determine the need of the individual town would require that the trial court determine the number of such units required not only for those who are living in the town at the time of the application, but also for those who desire to move into the town but cannot because of the lack of such housing.[8] Accordingly, in view of this legislative concern, it cannot reasonably be said that the legislature wanted affordable housing to be predicated on the then existing individual needs of 169 towns. Rather, because the legislature had before it the commission report focusing on statewide needs, it obviously had in mind this generalized need for affordable housing in the state of Connecticut. "[W]here a statute is capable of two constructions, one that is rational and effective in accomplishing the evident legislative object, and the other leading to 'bizarre results' destructive of that purpose, the former should prevail." *State* v. *Williams,* 206 Conn. 203, 210, 536 A.2d 583 (1988).

---

[8] The need of the town for affordable housing under any circumstances cannot be judged solely on the basis of the people already living in the municipality. "No person should be restricted in the right to obtain decent housing in any town, whether it be in towns as far west as Greenwich or as far east as Stonington." *Housing Authority* v. *Papandrea,* 222 Conn. 414, 442, 610 A.2d 637 (1992) (*Berdon, J.,* dissenting).

In sum, I would find that "need" has reference to the generalized statewide need for affordable housing as set forth in the commission report. Therefore, the trial court properly concluded, among other things, that the defendant was required to prove that the public interest—in this case, the size and density of the project—outweighed the generalized *statewide* need for affordable housing. Accordingly, I concur in the result reached by the majority.