[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
PROCEDURAL BACKGROUND
This action concerns an appeal by the plaintiffs, Lawrence Nizza and Ann Nizza (hereinafter, the "applicants") from the decision of the defendant, the Planning and Zoning Commission of the Town of Andover (hereinafter, the "Commission") denying their application to construct a 14 unit subdivision on 10 lots under General Statutes, Sec. 8-30g.
On January 15, 1993, the plaintiffs filed an application for CT Page 7884 approval of a subdivision with the defendant commission. The subject parcel lies in an R-80 zone and is comprised of 18.24 acres. The applicants originally gave the number of lots as 14. The proposal, however, was amended to 10 lots before the public hearing. The plaintiffs state that "[t]he development is affordable housing pursuant to C.G.S. Sec. 8-30g. Development is denser than the zone allows to lower costs. All lots will be deed restricted pursuant to the Affordable Housing Act."
The application includes a request for waiver of the roadway width specifications and the requirement of road completion prior to the issuance of building permits. It contains one other waiver request which reads as follows:
 II. The Subdivision has been designed as an affordable housing subdivision with an excess of 20% of the units to be developed deed restricted pursuant to the Statutory definition of affordable housing. The subdivision can only meet the Statutory guidelines if certain zoning regulations are waived. Waiver of Section 5 and in Section 11.3 of the Zoning Regulations is requested in regard to minimum lot area, width, side yard, total side yard, rear yard, floor area, and dwelling units. A certain number of duplexes are proposed. Several lots are less than 80,000 square feet.
(The court notes that there is no sec. 11.3 in the zoning regulations but that sec. 11.2 pertains to space requirements. The court, therefore, relies on sec. 11.2 for this discussion.)
On February 16, 1993, the Commission held a public hearing which was continued to and completed on March 15, 1993. On May 17, 1993 the Commission denied the application. The Commission gave the following reasons for its denial:
 1. The application fails to comply with subdivision and zoning regulations as itemized in the Plan Review prepared by Martha Fraenkel, dated May 14, 1993 and attached hereto.
 2. The subdivision is not compatible with the Plan of Development (POD), as updated in 1990, in the following respects:
 a. The application is inconsistent with goals for residential development (p. 28). CT Page 7885
 b. The application is inconsistent with goals for conservation ("To discourage the construction of new roads where slopes are severe" p. 30).
 c. The application is inconsistent with plans for future residential land uses. Classification of land for future use was based on factors which included "The desirability of the soil for development, including the suitability of the land for on-site sewer systems," "The slope and contours of the land," and "The pattern of past and present uses of the land" (p. 40). (sic)The area of the proposed subdivision was zoned for rural residential use, the least densely zoned residential category. It is unsuitable for such dense development.
 d. The application is inconsistent with the intention of the POD with respect to cluster development. The POD specifies that where clustering might be allowed "Such subdivisions should allow housing density no greater than would be allowed under conventional zoning." (p. 67)
 3. The proposed subdivision would cause the abutting Shaw property to become non-conforming due to inadequate setback from the proposed new road. This would impose a significant burden on this property and would be an illegal action by this Commission.
 4. The proposed subdivision would cause traffic safety problems because it would increase traffic to Bear Swamp Road, officially an "unimproved road." (The condition of this road is such that the Post Office will not deliver mail to boxes along the road, but requires that they be placed at the corner of Bear Swamp Road and Wheeling Road.)
 5. The proposed cul-de-sac does not meet size specifications designed to allow safe use.
 6. The proposed cul-de-sac serves more than 10 units, a limit intended by the restriction of lots to be served by a cul-de-sac (limited to 10). The limit was imposed to restrict the number of families dependent on a single road for emergency access.
 7. The proposed retaining wall is too close to the property line (5') to allow construction and/or maintenance without equipment going onto the abutting property. CT Page 7886
 8. The sedimentation and erosion controls would be critical given the severe slopes. The plan does not delineate slopes greater than 30% as was requested, making it difficult to evaluate the controls for the steepest slopes.
 9. The estimate of the cost of construction of improvements and sedimentation and erosion controls is not sufficiently detailed. It is reasonable to expect that these costs will be high because of the steep slopes and the extremely rocky soils. Without that information, it would be difficult for the commission to establish adequate bonding for project.
 10. The plan does not show off-street parking (2 spaces for each dwelling as required by zoning regulations.) Inadequate off-street parking would contribute to a traffic hazard if the proposed road were allowed to be constructed with a width of 24' as requested.
11. No waiver request for sidewalks was received.
On June 4, 1993 the applicants filed this appeal alleging that the action of the Commission is illegal and in violation of Secs. 8-2
and 8-30g of the General Statutes.
The parties argued the appeal to the court on March 22, 1994. At the court's request the parties filed supplemental briefs on April 4, 1994 and April 7, 1994.
AFFORDABLE HOUSING LAW, GENERAL STATUTES SEC. 8-30G
The Affordable Housing Land Use Appeals Act became effective in 1990. That Act modifies the procedure of judicial review of certain land use appeals to the Superior Court. The land use appeals affected are those in which the development proposed includes a certain percentage of affordable housing as defined by the Act.
Once the appeal is taken, the burden of proof of traditional zoning practice, which rests on the appellant, no longer applies. Sec.8-30g(c) provides as follows:
 Upon an appeal taken under subsection (b) of this section, the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission that (1) the decision from which such appeal is taken and the reasons CT Page 7887 cited for such decision are supported by sufficient evidence in the record; (2) the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; (3) such public interests clearly outweigh the need for affordable housing; and (4) such public interests cannot be protected by reasonable changes to the affordable housing development. If the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence in the record before it.
The reasons for the commission's decision must be supported by "sufficient evidence". The legislative history of the statute demonstrates that the legislature considered the evidentiary standard it set. In response to a colleague's question as to the meaning of sufficient evidence, and how it might relate to such standards as "fair preponderance of the evidence," "more probable than not," and "clear and convincing evidence", Representative Tulisano said "[It is] enough evidence to reach a particular conclusion. It is in fact a new system we're developing here today. It is none of the three. . . . It is not a very high standard whatsoever . . . . something has to be there and they will have sustained their burden. It is in fact a very easy thing to do." 32 H.R. Proc, Pt. 30, 1989 Sess., p. 10578-10579. Later during the debate, Representative Nickerson noted a change in the file copy, namely the substitution of the word "sufficient" for the word "substantial" and asked what effect that change would make. The following exchange occurred:
 Representative Cibes: [A]s I believe Representative Tulisano explained well, it lowers the level which must be satisfied. . . .
 Representative Nickerson: That sufficient evidence would be a lower standard than substantial evidence, is that correct?
 Representative Cibes: [Y]es.
 Representative Nickerson: The determination as to what is sufficient if we adopt the amendment or substantial if we adopt the file as amended, though, would be in the hands of the Appeals Court, not in the municipal body making the initial decision, it that correct. . .?
 Representative Cibes: [T]hat is correct. . . . CT Page 7888 Id., p. 10618-10620
Immediately following the foregoing exchange, Representative Nickerson inquired as to the substitution of the word "substantial" for "vital" in the file copy where the bill describes the interest to be protected. Representative Cibes replied that "[T]he intention is to lower the burden of proof for the community, to lower the level of interest which is required." Id., 10620. Later he added, "[t]he intent here it to ratchet down the level of interest that is required for the commission to demonstrate that it is correct." Id., 10621.
Of equal significance to the burden of proof is the definition of an affordable housing development. Sec. 8-30g(1) defines it as a "proposed housing development (A) which is assisted housing or (B) in which not less than twenty per cent of the dwelling units will be conveyed by deeds containing covenants or restrictions which shall require that such dwelling units be sold or rented at, or below, prices which will preserve the units as affordable housing as defined in section 8-39a, for persons and families whose income is less than or equal to eighty per cent of the area median income, for at least twenty years after the initial occupation of the proposed development. . . ."
At the beginning of the public hearing, the applicants submitted a letter from Patricia Downs, Director of the Department of Housing of the State of Connecticut. Record, Item 1-I. That letter states that Andover is not exempt from the procedure set forth in sec. 8-30g and that it has not requested an exemption from the appeals procedure. Many of the persons opposing the proposal questioned the need for affordable housing in Andover citing the many homes for sale which are in the same price range as the proposed units. The answer lies in the statutory definition of affordable housing. There was no evidence that any of the other properties were either deed restricted, as the proposed units, or "assisted housing."
Section 8-30g(a)(2) provides that "`an affordable housing application'" means any application made to a commission in connection with an affordable housing development by a person who proposes to develop such affordable housing."
The principal issue in the instant case is whether the commission violated sec. 8-30g by denying the plaintiffs' affordable housing development application. CT Page 7889
AGGRIEVEMENT AND STANDING
The Act permits an appeal by "[a]ny person whose affordable housing application is denied or is approved with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units. . . ." Sec. 8-30(b). Standing involves a question of legal status. One must have some real interest in the cause of the action, or a legal or equitable right, title or interest in the subject matter of the controversy. Mobil Oil Corp. v. Zoning Board ofAppeals, 35 Conn. App. 204, 208 (1994); Investors Mortgage Co. v.Rodia, 31 Conn. App. 476, 479 (1993). The Nizzas have standing as it is their application which the commission has denied.
Section 8-30g(b) also states that "[e]xcept as otherwise provided in this section, appeals involving an affordable housing application shall proceed in conformance with the provisions of . . . sections 8-8. . . ." Under traditional zoning appeals practice there must be an aggrieved party in order for the court to have jurisdiction to hear the appeal. The party claiming aggrievement must demonstrate a specific personal and legal interest in the subject matter of the decision as distinguished from a general interest, such as is the concern of all members of the community as a whole. In addition, the party must establish that this specific personal and legal interest has been specially and injuriously affected by the decision. Walls v. Planning Zoning Commission,176 Conn. 475, 478, 408 A.2d 252 (1979).
At all times stated herein, the applicants have owned the subject property. The owner of the property which forms the subject matter of the application is always aggrieved. Bossert v.Norwalk, 157 Conn. 279, 285, 253 A.2d 39 (1968). At the hearing and without objection the applicants introduced certified copies of deeds describing the property. In addition they filed the application which was denied. Therefore, they have fulfilled the requirements of standing and aggrievement.
REASONS FOR DENIAL
Before embarking upon an analysis of the reasons advanced by the commission in its denial it is well worth looking to the circumstances surrounding the enactment of Sec. 8-30g. A "Blue Ribbon Commission on Housing," established by the then Governor William A. O'Neill and the General Assembly, proposed the affordable housing appeals procedure in its final report in 1989. The CT Page 7890 Commission was aware of Huntington Branch NAACP v. Town ofHuntington, 844 F.2d 926 (2d Cir. 1988), aff'd 488 U.S. 15, reh. dan.488 U.S. 1023 (1988). In that case the court utilized a test which was adopted by the Third Circuit in Resident Advisory Board v. Rizzo,564 F.2d 126 (3d Cir. 1977), cert. denied 435 U.S. 908 (1978). Both cases involved challenges by low-income and minority persons whose housing needs were frustrated by local action. The balancing test which the commission must perform in subsection (c) of the Act is similar to the Huntington-Rizzo test, namely that the reasons for denial are bona fide and legitimate, and a less discriminatory alternative exists to meet those purposes. The Huntington court also divided the second test into two parts, namely those justifications which are "site specific" and those which are "plan specific." "Plan specific" problems can be resolved with less discriminatory design modifications, for instance, while "site specific" problems warrant review based on whether they are bona fide and legitimate. These tests, as Judge Berger pointed out inWisniowski v. Berlin Planning Commission, 10 Conn. L. Rptr. No. 9, 266 (December 13, 1993) correspond to Sec. 8-30g(c)(2), (c)(3) and (c)(4).
Given this framework, the court turns to a discussion of the reasons given by the commission for its denial of the application.
 1. The application fails to comply with subdivision and zoning regulations as itemized in the Plan Review prepared by Martha Fraenkel, dated May 14, 1993 and attached hereto.
On March 14, 1993 Martha Fraenkel, Zoning Agent, prepared a Plan Review for which she sought information from town officials and the developer and his representatives. She prepared a final plan review on May 14, 1993 (ROR, Item V, B).
At the May 17 public hearing Fraenkel told the commission that while many of the issues she had raised in her earlier plan review had been addressed, there were "still an extensive list of zoning violations. . . ." Donald Holmes, of Holmes and Henry Associates, "Consulting Engineers, land surveyors and land planners", the applicants' engineer, and Fraenkel discussed various issues, several of which had either been complied with or could be complied with such as "break[ing] out the erosion control estimate and get[ting] rid of the overall cost estimate." (ROR Transcript May 17, 1993, p. 66). Holmes agreed to provide bench marks and bury tree stumps remaining after the site had been cleared. He stated that stone walls would support "any side slope steeper than thirty CT Page 7891 percent."
The primary thrust of Fraenkel's plan review is the proposal's failure to comply with existing zoning and subdivision regulations. She notes that the commission, acting on a subdivision application does not "have any authority to waive the zoning regulations." (ROR Transcript March 15, 1993, p. 51). She states that "[t]he applicant must proceed to Zoning Board of Appeals." Under traditional zoning analysis these concerns would be sufficient reason for the court to sustain the commission's denial. In the affordable housing appeals procedure they are not.
Section 8-30g(a)(2) defines an affordable housing application as "[a]ny application made to a commission in connection with an affordable housing development. . . ." In West Hartford InterfaithCoalition, Inc. v. Town Council, 228 Conn. 498 (1994) the court stated that "[a]part from requiring that an application be made in connection with an affordable housing development proposal, thestatute contains no exceptions or qualifications limiting thedefinition of an affordable housing application to certain types ofapplications to zoning commissions . . . . we construe the language of sec. 8-30g to apply to every type of application filed with a commission in connection with an affordable housing proposal." Id., 509. (emphasis added).
In West Hartford, the plaintiff requested approval of a zone change and a special development district, which included requests for waivers of certain standards in the underlying zone change requested. The court traced the history of the statute's enactment. Speaking of the "Blue Ribbon Commission on Housing" which originally proposed the affordable housing appeals procedure the court said that the commission "described the need to increase density allowances and to circumvent prohibitively costly zoning and subdivision requirements: `Expanding the basis for an appeal gives would-be developers of affordable housing an opportunity to contrast specific zoning and low-density regulations or anti-growth practices, when encountered, with a community's need for affordable housing.'" (Internal citations omitted.) Id., 510-511. The court recognizes that "[a] town could remove itself entirely from sec. 8-30g
by eliminating any zones appropriate for the development of affordable housing. Conceivably, towns in which no land is zoned for multifamily housing would be wholly exempt from the statute. We refuse to construe sec. 8-30g to include an implied limitation that would be so antithetical to the intent of the legislature." Id., 511. CT Page 7892
Further evidence of the legislature's commitment to the construction of affordable housing can be seen in its encouragement of the development of regulations that provide for a special exemption to build multifamily dwelling units in excess of density limits. It provided a mechanism in General Statutes sec. 8-2g by which Andover could have developed its own regulations to permit affordable housing had it chosen to do so.
To appreciate Fraenkel's report, one must look to the uses permitted in the R-80 zone. The R-80 Rural Residence and Agriculture District permits the following uses among others: single-family dwellings, farms and agriculture, schools, churches, libraries, cemetaries, public parks, playgrounds, athletic fields, golf courses and accessory uses and buildings. Other uses require a special permit: professional offices in owner's home, hospitals, convalescent homes, riding stables, veterinarian and small animal hospitals, child care centers, wayside stands for the sale of agriculture and horticultural products, rear lots and private recreational areas. (Town of Andover Zoning Regulations, sec. 5).
The proposed subdivision has five two-family dwellings. Two-family residences if existing on June 30, 1983 are permitted only in the Business District. (Id., sec. 8.0.2). The Town of Andover does not provide for any affordable housing to be built under its subdivision or zoning regulations. The maximum number of dwelling units per conforming lot permitted in its residential districts is one. (Id., secs. 5.0.1., 6.0.1., 7.0.1., 7.0.2). A comparison of the minimum space requirements for the business zone or business zone adjacent to a residential zone where two-family dwellings are a permitted use are not significantly dissimilar to those of the R-80 zone except, of course, as to the lot size. In both zones the front yard space requirement is 100 feet. Total side yard footage in the R-80 zone is 25 fewer feet than in the Business zone adjacent to a residential zone. Building height in feet and number of stories is identical for each: 35/2. (Id., sec. 11.2).
A review of the legislative history demonstrates that the legislators foresaw the situation wherein a developer would propose greater density than a given zone permitted.
 Rep. Farr: [I]f the proposed plan called for a substantial change in the longstanding zoning in the area of the community, would that in itself be sufficient grounds for the denial?. . . Or to give you a better example, an area that's zoned single-family has got some vacant land and now the proposal is to put up multifamily, CT Page 7893 would that in itself be a basis for the denial?
 Rep. Cibes: [T]he answer is no, not per se. The municipality might have very good grounds for not having multifamily dwellings in the particular area. The soil type, the capacity of the infrastructure, various reasons such as that might have been a reason for the municipality not to adopt a particular zone for that particular area, but per se, there would not — it would not be a reason for rejecting this application.
32 H.R. Proc, Pt. 30, 1989 Sess., p. 10608.
The Fraenkel report cites numerous instances of noncompliance with area and setback requirements of the zoning regulations in the R-80 zone. By incorporating the entire report in its first reason for denial the commission has failed to link the noncompliance in area requirements, lot width requirements and setback requirements to any public interest in health, safety or welfare that outweighs the need for affordable housing. The legislature has determined that a need for affordable housing exists throughout the state. Therefore, noncompliance with zoning regulations per se, is not sufficient to deny an affordable housing application.
As to requiring the assignment and acceptance of open spaces General Statutes sec. 8-25 authorizing open space requirements specifically states "[T]he open space requirements of this section shall not apply . . . if the subdivision is to contain affordable housing." In this particular area, then, the commission has no power to regulate.
The record does not support the commission's denial based on Fraenkel's May report. The commission could have proposed reasonable changes to the development proposal to address any outstanding unsatisfied requirements.
Issues regarding the cul-de-sac, the width of Hale Road, the driveways and sidewalks are bona fide and legitimate health and safety concerns. They are discussed below as they appear in other reasons the commission gave for denial.
 2. The subdivision is not compatible with the Plan of Development (POD) as updated in 1990, in the following respects: CT Page 7894
 a. The application is inconsistent with goals for residential development (p. 28).
 b. The application is inconsistent with goals for conservation ("To discourage the construction of new roads where slopes are severe." p. 30).
 c. The application is inconsistent with plans for future residential land uses. Classification of land for future use was based on factors which included "The desirability of the soil for development, including the suitability of the land for on-site sewer systems," "The slope and contours of the land," and "The pattern of past and present uses of the land" (p. 40). The area of the proposed subdivision was zoned for rural residential use, the least densely zoned residential category. It is unsuitable for such dense development.
 d. The application is inconsistent with the intention of the POD with respect to cluster development. The POD specifies that where clustering might be allowed, "Such subdivisions should allow housing density no greater than would be allowed under conventional zoning." (p. 67)
Connecticut courts have traditionally viewed plans of development as advisory only, Levinsky v. Zoning Commission,144 Conn. 117, 123, 127 A.2d 822 (1956); and non-binding on land-use commissions. Dooley v. Town Plan and Zoning Commission, 154 Conn. 470,473, 226 A.2d 509 (1967);
In addition, a review of the legislative history of 8-30g shows that the legislators recognized that there might well be a conflict between the statute and an existing plan of development.
 Rep. Farr (19th) [I]f the proposed development was inconsistent with the municipality's plan of development would that in itself be grounds, sufficient grounds for denial upon appeal?
 Deputy Speaker Smoko: Would you care to respond?
 Rep. Cibes: Through you, Mr. Speaker that, I think, would not be the case . . . . the incompatibility of a particular developer with municipality's plan of development would not be a reason. You would have to look at the underlying rationale and the commission would have to CT Page 7895 advance those reasons.
32 H.R. Proc., Pt. 30, 1989 Sess., p. 10607-10608.
The underlying rationale of the POD is found in its stated purpose which did not suggest a plan to include a mix of housing. Rather it stressed the citizens' "wish to retain the general `quality of the town — its rural residential character and its historicic (sic) heritage. . . ." Andover Plan of Development, p. 3. The POD made no reference to the legislative goals of sec. 8-30g adopted in 1989 or of PA 89-277 which added to section 8-2 of the General Statutes, namely the provision that "[S]uch regulations shall also promote housing choice and economic diversity in housing, including housing for both low and moderate income households. . . ." or to other legislative expressions of the statewide need for affordable housing. See Pratt's Corner Partnership v. Southington Planning and ZoningCommission, 9 Conn. L. Rptr., No. 10, 291 (July 26, 1993).
Since the POD's underlying rationale gives no consideration to the issue of affordable housing and reiterates the desires of Andover residents, as expressed in the results of a questionnaire, to preserve the status quo it does not evidence public interests that clearly outweigh the need for affordable housing.
The commission's reliance on the POD, therefore, as a reason for its denial of the proposal is misplaced and cannot be sustained.
 3. The proposed subdivision would cause the abutting Shaw property to become non-conforming due to inadequate set-back from the proposed new road. This would impose a significant burden on this property and would be an illegal action by this commission."
At the public hearing on March 15, 1993 Paul Shaw, an abutting owner, claimed that the location of the proposed street would cause his property to become nonconforming as to setback requirements. (ROR, Transcript, March 15, 1993, p. 3-4) Towne Engineering Review also pointed to the fact that Paul Shaw's property would become "illegal or non-conforming." (ROR Item IX (C)). Martha Fraenkel listed that in her report stating that the "Shaw lot must comply with setbacks for corner lots; Subdivision regulations A-1 requires two front yards. Front yard requirement is 100 ft., as measured from center of road. Shaw house will be 80 ft. from center of Hale Rd." (ROR Item V (B)). CT Page 7896
While sec. 2.2 of the subdivision regulations call for subdivision plans to conform to the subdivision regulations and the comprehensive plan of the town, the regulations do not require a developer to set back a proposed road any particular distance from an already existing lot not within the proposed subdivision.
In Kordiak v. Town of Woodbridge, 9 Conn. L. Rptr. No. 14, 444 (August 23, 2993 [1993]) the court looked to General Statutes sec. 8-26
which provides in pertinent part that "[N]othing in this section shall be deemed to authorize the [planning] commission to approve any such subdivision or resubdivision which conflicts with applicable zoning regulations." The court rejected the argument of the appellant abutting owners that the approval of the subdivision application violated sec. 8-26 in that the proposed road would reduce the side yards of the abutting properties to less than the dimensions required by the applicable zoning regulations. The court held that sec. 8-26 refers not to adjoining properties but to the land that is to be divided. Id., 445. The court found no requirement in the Woodbridge subdivision regulations "concerning the effect of a subdivision on the compliance of adjoining lots with setback requirements." Id., 445.
There is no provision in the Andover subdivision regulations requiring a developer to set back a proposed subdivision road a certain distance from the property of an abutting owner. There is no provision in the subdivision regulations which prohibits the creation of a nonconforming lot outside the proposed subdivision.
In the event that the Shaw property becomes nonconforming, it does not become illegal. The law relating to nonconforming use protects the rights of a user to continue the same use of the property as existed prior to the adoption of the zoning regulations.Gilbertie v. Zoning Board of Appeals, 23 Conn. App. 444, 446,581 A.2d 747 (1990), Helbig v. Zoning Commission, 185 Conn. 294, 306,440 A.2d 940 (1981).[1]
In this instance, the third reason is not sufficient for denial.[2]
 4. The proposed subdivision would cause traffic safety problems because it would increase traffic to Bear Swamp Road, officially an "unimproved road". (The condition of this road is such that the Post Office will not deliver mail to boxes along the road but requires that they be placed at the corner of Bear Swamp Road and Wheeling Road. CT Page 7897
The impact of development on traffic and area roads is a legitimate concern affecting the safety and general welfare of the public. Bear Swamp Road is listed as an unimproved road in Appendix I at page A-9 of the subdivision regulations. An unimproved road is "[a]ny street, avenue, road, land, alley or other public way, exclusive of driveways, that is not built to current Town of Andover road specifications as outlined in the Town of Andover Subdivision Regulations, Section 7.2." (Subdivision Regulations, sec. 11.3, no. 44). (The Court believes that the reference to section 7.2 is a typographical error and that the correct reference should be to section 17.2 at pages MI-6.) Section 17.2 sets forth requirements for roadway design and construction of new roads resulting from the development of a subdivision.)
The fact that the Post Office does not deliver mail is not, in and of itself, conclusive as to the condition of Bear Swamp Road. Nothing in the record provides sufficient evidence as to the rationale behind the Post Office decision. There may be factors such as too few mail carriers, time limitations for a mail run, or budgetary constraints to name a few.
While the presence of any subdivision, residential, industrial or commercial is likely to increase traffic on the adjacent roads, the mere increase itself does not cause traffic safety problems sufficient to prevent development. The legislative history shows that Representative Farr asked whether increased traffic in a single-family area would be sufficient grounds for denying an application. Representative Cibes replied that in and of itself it would not be sufficient grounds absent evidence in the record. He stressed the need for the Commission to demonstrate a substantial public interest that would outweigh the need for affordable housing in Connecticut. 32 H.R. Proc, Pt. 30, 1989 Sess., p. 10609-10610.
Here, the Commission had an opportunity to devise its own solutions by suggesting reasonable changes. It did not do so. Therefore, it failed to engage in the balancing test called for by the Act.
The evidence in the record does not meet the threshold of sufficient evidence. At the public hearing on February 16, 1993, the applicant's engineer addressed the Commission. The defendant takes issue with Holmes' credentials noting that his firm's letterhead does not make reference to traffic engineering. The commission did not inquire as to Holmes' credentials. No CT Page 7898 Commission member questioned his ability to interpret the materials he sent the Commission on March 10, 1993 with a letter in reply to a question. The question asked at the February 16, 1993 public hearing was "[D]oes Bear Swamp Road have the capacity to carry the traffic from 14 additional houses?"
Holmes concluded that Bear Swamp Road had the capacity to carry the traffic from 14 additional houses. Further, he concluded that based on the traffic generated by the 32 houses using Bear Swamp Road, as that traffic is calculated in the ITE Generation Report (ROR Item No. I-(G), p. 17-19) there would remain 331 trips of excess capacity to Bear Swamp Road after the additional 14 houses were built.
The Trip Generation Report used was the Third Edition prepared in 1982. The Commission did not request updated calculations, if any, nor did it provide its own. It is the obligation of the Commission to provide sufficient evidence on the record to sustain its reasons. Under traditional zoning appeals procedure deference may be given to the personal knowledge of commission members on matters readily within their competence such as traffic congestion and street safety. Feinson v. Conservation Commission,180 Conn. 421, 427, 429 A.2d 910 (1980), citing Welch v. ZoningBoard of Appeals, 158 Conn. 208, 214, 257 A.2d 917 (1967). Under sec. 8-30g appeals procedure such knowledge may not carry the day.
Therefore, the commission has failed to sustain its burden of proof with regard to the fourth reason for denial.[3]
 5. The proposed cul-de-sac does not meet size specifications designed to allow safe use.
 6. The proposed cul-de-sac serves more than 10 units, a limit intended by the restriction of lots to be served by a cul-de-sac (limited to 10). The limit was imposed to restrict the number of families dependent on a single road for emergency access.
 10. The plan does not show off-street parking (2 spaces for each dwelling as required by zoning regulations). Inadequate off-street parking would contribute to a traffic hazard if the proposed road were allowed to be constructed with a width of 24' as requested.
11. No waiver request for sidewalks was received. CT Page 7899
The concerns which gave rise to reasons 5, 6, 10 and 11 for denial are related to the design of Hale Road and the driveways which lead to it. For this reason, the court considers these reasons together.
Section 7.5.2(b) of the Andover subdivision regulations provides that a cul-de-sac shall terminate with a turn around which has a minimum pavement radius of fifty (50) feet.
In Reason 6 the Commission expands upon its rationale citing section 7.5.2(a) of the subdivision regulations which states that a cul-de-sac may not serve more than 10 building lots. Access for emergency vehicles is a legitimate public safety concern for the Commission to consider.
On December 7, 1992, Martha Fraenkel, Zoning Agent sent a Request for Review to Wally Barton, Fire Marshal (ROR Item III(A), p. 34). In her request Fraenkel sent the plans for the subdivision and stated "[c]oncern here is for the adequacy of driveway cuts and turnarounds due to steep terrain." On January 11, 1993, Barton responded to Fraenkel's request and stated that ". . . the roadway appears adequate for fire apparatus access." Barton, however, suggested a design change, namely that a 20 foot by 30 foot dedicated turnaround be provided for each driveway. (ROR Item II(C), p. 29).
The record includes a report by Towne Engineering, Inc. which was written to Marty Derrig, a resident of Bear Swamp Road. (ROR Item IX (C), p. 100-103). Derrig had apparently requested that Towne review the materials and site. From the report it is not clear what materials Towne reviewed. Towne characterized its involvement as a "limited review of the Oak Ridge Subdivision for its conformance to sound engineering principals (sic)" and not for conformance to the Andover subdivision or zoning regulations.
In Item 14 of the report, Towne asked whether the cul-de-sac is one way "as it is too narrow for two-way traffic." Towne further commented that proper signage should be shown. Section 11.3.32 of the subdivision regulations defines right-of-way width as "[t]he distance between property lines reserved for vehicular and pedestrian traffic." Section 16.3.1 provides that "[n]o proposed street shall have a right-of-way width of less than fifty (50) feet nor a pavement width of less than thirty (30) feet."
Reasons 10 and 11 reiterate those concerns reflected in items CT Page 7900 8 and 10 of the Fraenkel report of May 14, 1993. This is an area of legitimate concern for the commission as it bears directly on the public's safety. It is evident to the court, having viewed the property, that the slope of the property, the nonconforming width of the road, and the absence of sidewalks would pose a threat to the public's safety. This would be especially so when icy conditions obtain.
The commission failed to consider the alternative of reasonable changes to the plans, such as the turnaround area and signage. As a result, it failed to meet its burden of proving that the public interests could not be protected by reasonable changes to the plan with regard to the cul-de-sac, the driveways, the road width and sidewalks.
The court remands these issues to the commission to address whether these safety concerns can be resolved by reasonable changes to the plan.
 7. The proposed retaining wall is too close to the property line (5') to allow construction and/or maintenance without equipment going onto the abutting property.
At the public hearing on February 16, 1993, Commissioner Howard questioned Holmes about the "retaining wall in its current form." (ROR, Transcript, February 16, 1994, p. 12). Holmes stated that after a field trip to the site with commission members he had reduced the grade of the wall from "a twelve to fourteen foot high reinforced concrete retaining wall" to be replaced by a "much smaller, shorter wall." (Id., p. 12). Holmes stated that while the "standard for road edge treatment. . .metal beam rails" was not favored by some towns for their appearance, the plan could be changed to extend the retaining wall up high enough to provide a safety berm." (Id., p. 12). Native stone replaced concrete as the material for the wall. (Id., p. 13).
On March 15, 1993 Commissioner Howard returned to the subject of the retaining wall and its maintenance. Holmes stated that the wall was "ten feet from the property line . . . . [t]here is no need for the town to go on to Mr. Shaw's land and maintain the wall." (Transcript, March 15, 1993, p. 68). He agreed that the wall would become the town's responsibility to maintain.
There was no evidence provided as to what maintenance of the retaining wall would involve nor of the type of equipment required CT Page 7901 to maintain the wall. No commission member expressed sufficient knowledge about retaining walls to contribute any expertise. SeeFeinson v. Conservation Commission, supra, 180 Conn. 421. The commission could have suggested or asked for reasonable changes to the plan under subsection (c)(4) of the Act.
There is no evidence in the record to support the commission's reasons for denial.
 8. The sedimentation and erosion controls would be critical given the severe slopes. The plan does not delineate slopes greater than 30% as was requested, making it difficult to evaluate the controls for the steepest slopes.
 9. The estimate of the cost of construction of improvements and sedimentation and erosion controls is not sufficiently detailed. It is reasonable to expect that these costs will be high because of the steep slopes and the extremely rocky soils. Without that information, it would be difficult for the commission to establish adequate bonding for the project.
The information regarding sedimentation and erosion controls for slopes, if any, greater than 30% is a serious public safety issue. At the public hearing Holmes indicated that he would provide more detailed information on the actual plans. Further, while it is necessary for the commission to obtain realistic cost data there is insufficient evidence to conclude that such further information will not be forthcoming.
Section 8 of the Subdivision Regulations permits the commission to call a bond at the end of a one year period and to recalculate it if the improvements have not been completed. It is important to remember that the Town of Andover does not lose control of an approved project. Under the regulations the commission oversees the various stages through the permit process. It will obtain "as built" construction plans and release, or withhold, a certificate of compliance. (ROR, Subdivision Regulations, sec. 6.11)
The commission's denial cannot be sustained for the reasons given above as there is no evidence that the proposal could not be effectuated as planned.
CONCLUSION CT Page 7902
For the foregoing reasons, the court sustains the applicant's appeal and reverses the commission's decisions with regard to reasons 1, 2, 3, 4, 7, 8 and 9. The court remands the issues raised in reasons 5, 6, 10 and 11 to the commission for the purpose of resolving the public safety concerns by reasonable changes to the plan.
Leheny, J.