[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
1. INTRODUCTION
 A.
The present appeal is brought by the plaintiff, Charles A. Rinaldi (hereinafter "applicant"), from the decision of the defendant, Suffield Zoning and Planning Commission (hereinafter "Commission"), denying his application for a special use permit. The project he proposes consists of 52 units of single family housing to be constructed on 10 acres of land pursuant to General Statutes, Sec. 80-30g. The applicant had filed a request for a special use permit on July 19, 1993, which was denied by the Commission on October 18. Subsequently, the plaintiff filed a modification of the special use permit application on November 5. On December 6, the Commission held a public hearing. On December 27, 1993, it denied his request for the special use permit.
The Commission gave the following reasons for its denial:
1. Single family detached dwellings are not a permitted use of land in the PDA zone. CT Page 50
2. The zoning regulations contain no dimensional requirement for single family homes in the PDA zone such as, but not limited to, required front, side and rear yards, minimum lot area per dwelling unit, minimum usable open space, maximum lot coverage, minimum building height and minimum size of dwelling units.
3. The applicant has not submitted an application to the Commission establishing dimensional requirements for the construction of single family detached homes in the PDA zone or permitting the same to be built therein.
4. The applicant requested "waivers (variances)" of the zoning regulations by the Commission, which, by law, does not have the power to grant such requests. The requested modifications of the zoning regulations would compromise the quality of life for those living in this proposed project.
5. One point seven (1.7) acres of the 10 acre site proposed for development contain drainage detention ponds and a designated wetland. Houses are crowded together (15 feet apart) on a side hill which leaves no usable area between units and very limited yards. No provision is made for usable open space which the Commission believes is essential to establish a reasonable quality of life for those residing within the proposed development. Children would probably look to the detention ponds and wetlands as a place to play, which is undesirable and unsafe.
6. Public health and safety would be jeopardized by the congested nature of the development and the lack of parking facilities which would force visitors and residents to park their vehicles on streets with minimum capacity for parked vehicles. This would be a maintenance problem as well as a safety problem especially during the winter months. In addition, due to lack of recreational areas, children would be likely to play on streets with vehicles parked on both sides placing them at risk; the berm and drainage swale within 5 feet of houses bordering Route No. 159 is a potential problem.
7. The proposed project involves a very high density of detached single family housing, which will have a much greater impact in terms of public safety and quality of life concerns than would a similar density of attached units as intended for the PDA zone. CT Page 51
8. House proposals are not definitive — testimony indicated that units would be "something like" illustrations presented to the Commission. Said illustrations were not accurately drawn and were actually misleading.
9. There was evidence presented that this project would have an adverse impact on the neighborhood.
10. The report of William G. Kweder, Planning Consultant, and Gerald J. Turbet, Town Engineer, to the Commission dated December 6, 1993, consisting of four pages, amplifies many of the reasons for denial set forth herein, and said report is incorporated into this decision and the content thereof is given as an additional reason for denial.
SUMMARY PARAGRAPH:
In the opinion of the Commission, based upon the record of the proceedings before it with respect to this particular application, the proposed development, for the reasons stated herein, does not adequately protect the public health, safety and welfare of its residents and is therefore denied.
The applicants filed this appeal on January 7, 1994 alleging that the Commission acted illegally, arbitrarily, capriciously, in abuse of its discretion in violation of plaintiff's rights and in violation of General Statutes, Sec. 8-30g. The court heard oral argument on September 7, 1994.
At the court's request, the defendant filed a transcript of the meeting of December 20, 1993 on November 21, 1994. The court did not obtain a copy of the transcript of the December 27, 1993 meeting.
 B.
The Affordable Housing Land Use Appeals Act, codified in General Statutes, Sec. 8-30g, became effective in 1990. The Act modifies the procedure of judicial review of certain land use appeals to the Superior Court. The land use appeals affected are those in which the development proposed includes a certain percentage of affordable housing as defined by the Act. Once the appeal is taken, the burden of proof of traditional zoning practice, which rests on the appellant, no longer applies. Section 8-30g(c) provides as follows: CT Page 52
 Upon an appeal taken under subsection (b) of this section, the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission that (1) the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record; (2) the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; (3) such public interests clearly outweigh the need for affordable housing; and (4) such public interests cannot be protected by reasonable changes to the affordable housing development. If the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence in the record before it.
The reasons for the Commission's decision must be supported by "sufficient evidence." The legislative history of the statute demonstrates that the legislature considered the evidentiary standard it set. In response to a colleague's question as to the meaning of sufficient evidence, and how it might relate to such standards as "fair preponderance of the evidence," "more probable than not," and "clear and convincing evidence," Representative Tulisano said, "[It is] enough evidence to reach a particular conclusion. It is in fact a new system we're developing here today. It is none of the three . . . . It is not a very high standard whatsoever . . . something has to be there and they will have sustained their burden. It is in fact a very easy thing to do." 32 H.R. Proc., Pt. 30, 1989 Sess., p. 10578-10579. Later during the debate, Representative Nickerson noted a change in the file copy, namely, the substitution of the word "sufficient" for the word "substantial" and asked what effect that change would make. The following exchange occurred:
 Representative Cibes: [A]s I believe Representative Tulisano explained well, it lowers the level which must be satisfied . . . .
 Representative Nickerson: That sufficient evidence would be a lower standard than substantial evidence, is that correct?
 Representative Cibes: [Y]es
 Representative Nickerson: The determination as to what is sufficient if we adopt the amendment or substantial if we adopt the file as amended, though, would be in the hands of the Appeals Court, CT Page 53 not in the municipal body making the initial decision, is that correct . . . ?
 Representative Cibes: [T]hat is correct . . . . Id., p. 10618-10620.
Immediately following the foregoing exchange, Representative Nickerson inquired as to the substitution of the word "substantial" for "vital" in the file copy where the bill describes the interest to be protected. Representative Cibes replied, "[T]he intention is to lower the burden of proof for the community, to lower the level of interest which is required." Id., 10620. Later he added, "[t]he intent here is to ratchet down the level of interest that is required for the commission to demonstrate that it is correct." Id., 10621.
An affordable housing development is defined as a "proposed housing development (A) which is assisted housing or (B) in which not less than twenty per cent of the dwelling units will be conveyed by deeds containing covenants or restrictions which shall require that such dwelling units be sold or rented at, or below, prices which will preserve the units as affordable housing, as defined in section 8-39a, for persons and families whose income is less than or equal to eighty per cent of the area median income, for at least twenty years after the initial occupation of the proposed development . . . ." (General Statutes, Sec. 8-30g(1).)
Section 8-30g(a)(2) provides that "'an affordable housing application"' means any application made to a commission in connection with an affordable housing development by a person who proposes to develop such affordable housing . . . ."
The Act permits an appeal by [a]ny person whose affordable housing application is denied or is approved with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units . . . ." Section 8-30g(b).
Section 8-30g(b) also states that [e]xcept as otherwise provided in this section, appeals involving an affordable housing application shall proceed in conformance with the provisions of said sections 8-8 . . . ." Under traditional zoning appeals practice, there must be an aggrieved party in order for the court to have jurisdiction to hear the appeal. The party claiming CT Page 54 aggrievement must demonstrate a specific personal and legal interest in the subject matter of the decision as distinguished from a general interest, such as is the concern of all members of the community as a whole. In addition, the party must establish that this specific personal and legal interest has been specially and injuriously affected by the decision. Walls v. Planning Zoning Commission, 176 Conn. 475, 478, 408 A.2d 252
(1979).
This court has also considered this action from the viewpoint of standing to appeal.
Standing involves a question of legal status. One must have some real interest in the cause of the action, or a legal or equitable right, title or interest in the subject matter of the controversy. Mobil Oil Corp. v. Zoning Board ofAppeals, 35 Conn. App. 204, 208 (1994); InvestorsMortgage Co. v. Rodia, 31 Conn. App. 476, 479 (1993).
Charles A. Rinaldi testified that he owned the subject property at the time of the application through the present. He submitted a deed evidencing ownership. The owner of the property which forms the subject matter of the application is always aggrieved. Bossert Corporation v. Norwalk, 157 Conn. 279,285, 253 A.2d 39 (1968). He was the person who filed the affordable housing application. Therefore, the applicant has fulfilled the requirements of standing and aggrievement.
II. DISCUSSION
 A.
The first, second and seventh reasons relate to the requirements of the Planned Development Apartment District (hereinafter "PDA Zone") wherein the plaintiff's proposed development is located.
 1. Single family detached dwellings are not a permitted use of land in the PDA Zone;
 The Zoning Regulations contain no dimensional requirement for single family homes in the PDA Zone such as, but not limited to, required front, side and rear yards, minimum lot area per dwelling unit, minimum usable open space, maximum lot coverage, minimum building height and minimum size of dwelling units; CT Page 55
 7. The proposed project involves a very high density of detached single family housing, which will have a much greater impact in terms of public safety and quality of life concerns than would a similar density of attached units as intended for the PDA zone;
Section 2.12 of the Zoning Regulations of the Town of Suffield provides as for lows:
 The purpose of this district is to provide carefully controlled areas meeting specific minimum design standards, for those residents who cannot or do not wish to have personal responsibility for the maintenance of residential property, for those who cannot assume financial obligations of owning or maintaining individual residential dwellings or for other reasons prefer the more urbanized environment character associated with multi-family residential areas . . . . ROR, Item 73, p. 1789.
The plaintiff argues that section 4.21 of the Zoning Regulations indicates that a one-family house on one lot is a permitted use in the PDA Zone. (ROR, Item 73, p. 1819.) The "lot" here has no dimension because the plaintiff intends to retain ownership of the land. He has not subdivided the 10 acre parcel into individual lots to accompany each dwelling. He cannot, therefore, argue that a one-family dwelling is permitted on one lot since he has not defined the lot.
The schedule of areas as set forth in section 4.76.2 of the Zoning Regulations states that the minimum gross lot per dwelling unit for any of the PDA uses, namely, garden apartments, townhouses and apartments is 8,700 square feet. (ROR, Item 73, n. 1845.)
The plaintiff argues, however, that the Commission had already allowed two developments wherein single family detached dwellings exist in the PDA Zone. The Commission's position is that the projects were approved over ten years ago and "[t]he interpretation of the regulations, at that time, which have been substantially amended, is not the same today as it was then." (ROR, Item 82, p. 16, remarks of William Kweder, Planning Consultant.)
There is insufficient evidence in the record to support Kweder's statement. This court does not have a copy of the regulations under which these two projects were approved. This CT Page 56 court does not have evidence that the regulations themselves were "substantially amended." The issue as to whether there was a substantial amendment might well be a determination for this court. Further, there is no evidence in the record providing the "interpretation" given the regulations when the two developments were approved. If there was not a substantial amendment to the regulations but the interpretation was modified, the plaintiff is justified in his claim that the Commission approved developments which differed from established standards. He is further justified in arguing that his proposal should not be prohibited because, even though the use is not permitted, the Commission could determine that his proposal is sufficiently similar to these two development uses. (See ROR, Item 73, p. 1818, Sec. 4.10.)
Since the real issue here is density, however, it must be noted that the plaintiff geared his proposal to the standard provided for the minimum lot area for the PDA zone which is 8,700 square feet. (ROR, Item 73, p. 1845.) That translates to a standard of five units per acre. The plaintiff proposes 5.2 units per acre. (ROR, Item 79, map 2.)
The legislature envisioned the possible inconsistencies between the zoning regulations and an affordable housing development in the area of use and density. In the debate, the following exchange occurred:
 Representative Farr: [I]f the proposed plan called for a substantial change in the longstanding zoning in the area of the community, would that in itself be sufficient grounds for the denial? . . . or to give you a better example, an area that's zoned single-family has got some vacant land and now the proposal is to put up multifamily, would that in itself be a basis for denial?
 Representative Cibes: [T]he answer is no, not per se. The municipality might have very good grounds for not having multifamily dwellings in the particular area. The soil type, the capacity of the infrastructure, various reasons such as that might have been a reason for the municipality not to adopt a particular zone for that particular area, but per se, there would not — it would not be a reason for rejecting this application.
32 H.R. Proc., Pt. 30, 1989 Sess., p. 10608.
Therefore, the density issue can be resolved in the CT Page 57 plaintiff's favor as he has complied with the standard established in the zoning regulation.
Accordingly, the Commission's first, second and seventh reasons for denial cannot stand because they are not supported by sufficient evidence in the record.
The third and eighth reasons are as follows:
 3. The applicant has not submitted an application to the Commission establishing dimensional requirements for the construction of single family detached homes in the PDA Zone or permitting the same to be built therein;
 8. House proposals are not definitive — testimony indicated that units would be "something like" illustrations presented to the Commission. Said illustrations were not accurately drawn and were actually misleading.
There are no dimensional standards specifically set forth for dwellings in the PDA Zone. "Zoning regulations, as they are in derogation of common law property rights, cannot be construed to include or exclude by implication what is not clearly within their express terms. [Citations omitted.] A property owner should be able reasonably to ascertain from the regulations how to use the property in compliance with them." Planning ZoningCommission v. Gilbert, 208 Conn. 696, 705, 546 A.2d 843.
The procedure for reviewing a special use permit is set forth in section 6.13.1d of the Zoning Regulations. (ROR, Item 73, p. 1875.) The regulations do not specifically require that an "application establishing dimensional requirements" be filed ab initio. A special permit application falls within the definition of "any application made to a commission" pursuant to section 8-30g. See West Hartford Interfaith Coalition. Inc. v. TownCouncil, 228 Conn. 498, 508, 509, 636 A.2d 1342.
Section 6.13.1d permits the Commission to attach specific conditions to a special Permit application. This section provides as follows:
 The Planning Commission shall make a finding that each of the following standards is met, and where necessary, shall attach specific conditions to its approval of the special use permit, if in its opinion, such conditions are essential to make the finding: CT Page 58
 1. The location and size of the use, the nature and intensity of the operations connected with it, the size of the lot in relation to it, and the location of the lot with respect to streets giving access to it, are such that it will be in harmony with the appropriate and orderly development of the district in which it is located.
 2. The kind, location and height of all structures and the nature and extent of the landscaping on the lot are such that the use will not hinder or discourage the appropriate development and use of adjacent properties.
 3. The parking and loading facilities are adequate and properly located for the proposed use, and the entrance and exist [sic] driveways shall be laid out so as to achieve maximum safety.
(ROR, Item 73, p. 1875.)
The Commission did not follow its own procedure and attach specific conditions to the approval. While this omission might not be fatal to the Commission's decision in a traditional zoning appeal, it is fatal in the affordable housing appeal procedure.
The Commission could have approved the proposal with specific conditions as to the number of each type of dwelling, and the size of the units. The exhibits submitted with the application had sufficient information so as to provide a basis for the Commission's attachment of more specific conditions. The Commission failed to meet its burden of proving that the public interest could not be protected by reasonable changes to the proposal.
Conditions attached to the approval would then be enforced further along in the process as the Building Inspector and Zoning Enforcement Officer exercised their authority in obtaining compliance with the applicable statutes regulations and conditions of approval.
 Reason 4. The applicant requested `waivers (variances)' of the zoning regulations by the Commission, which, by law, does not have the power to grant such requests. The requested modifications of the Zoning Regulation would compromise the quality of life for those living in this proposed project.
Section 4.764 of the Zoning Regulations provides that the CT Page 59 Commission may modify or waive the minimum requirements in the case of public housing, or housing for the elderly or handicapped. (ROR, Item 73, p. 1844.) This type of housing is built pursuant to governmental policies which recognize the need for such housing. Similarly then, the Connecticut legislature envisioned the use of waivers to permit the development of affordable housing.
There was insufficient evidence to support the Commission's conclusion that the "requested modifications . . . would compromise the quality of life for those living in the proposed project." The discussions on this point were generalized and had no evidentiary foundation. The quality of life issues must be tied by the Commission into evidence that health and safety issues outweigh the need for affordable housing, a need expressly determined to exist by the legislative. The Commission, therefore, failed to bear its burden on proof on this reason for denial.
 Reason 5. 1.7 acres of the 10 acre site proposed for development contains drainage detention ponds and a designated wetland. Houses are crowded together (15' apart) on a side hill which leaves no usable area between units and very limited yards. No provision is made for usable open space which the Commission believes is essential to establish a reasonable quality of life for those residing within the proposed development. Children would probably look to the detention ponds and wetlands as a place to play, which is undesirable and unsafe.
The Commission expressed concern over the lack of usable open space considering it "essential to establish a reasonable quality of life for those residing with the proposed development." It is unclear what the Commission meant by this. On the one hand, it rejected the proposal for not conforming to section 4.76.2; yet, on the other hand, it rejected 15 feet of space adjacent to a child's home as being less preferable than a large common area at a distance from a child's home which is provided in the condominium development cited. Arguments for and against either type of recreation area could be made but conclusions would only be speculative in nature. Further, the Commission could have attached specific conditions for enclosing the detention ponds and wetlands to prevent children's access.
The problem unresolved by the Commission is that the applicant has no right to use the open space even at Suffield's CT Page 60 Landing. This situation would appear to require court interpretation of the original documents and transcripts of the approval of Suffield Landing. There is insufficient evidence in this record for this court to make any such determination. As to requiring the assignment and acceptance of open space, it is noteworthy that General Statutes, Sec. 8-25 concerning subdivision specifically states that the open space requirements of this section shall not apply if the subdivision is to contain affordable housing.
While its aims are laudatory, therefore, the Commission falls short of meeting its burden of proving that the public interest in open space clearly outweighs the need for affordable housing and that the public interest could not protected by reasonable changes to the development.
 Reason 6. Public health and safety would be jeopardized by the congested nature of the development and the lack of parking facilities which would force visitors and residents to park their vehicles on streets with minimum capacity for parked vehicles. This would be a maintenance problem as well as a safety problem especially during the winter months. In addition, due to lack of recreational areas, children would be likely to play on streets with vehicles parked on both sides placing them at risk; the berm and drainage swale within five feet of houses bordering Route #159 is a potential problem.
At the center of this reason for denial is the fact that the Commission was uncertain as to the number of parking spaces the zoning regulations required. A dwelling unit requires two parking spaces while a townhouse requires three. (Section 4.76.5, p. 1847.)
Gerald J. Turbet, Town Engineer, stated that there was "room based on the parking regulations" to "handle a pretty good amount of parked vehicles off the street. (Transcript of December 20, 1993 meeting at p. 10 submitted at court's request, and not included in Return of Record.)
The Commission hypothesized situations where parking would occur on the streets and children thereby endangered. However, Kweder stated that "there are unknowns here, unless they write something in that's mandatory where the garage be used for the cars." (Id., p. 11.)
In this second application, the plaintiff addressed safety CT Page 61 concerns the Commission had with the first, namely, the width of the streets and sidewalks. He enlarged both. Furthermore, the concerns about the berm and drainage swale were generalized and their impact on the public health and safety was not specified. In this instance, the Commission had the burden of proving that the public's safety could not be protected by reasonable changes to the development. The court remands this reason for denial to the Commission for further consideration of the parking issue not inconsistent with this opinion.
 Reason 9. There was evidence presented that this project would have an adverse impact on the neighborhood.
There was insufficient evidence that the addition of fifty-two (52) homes would have an adverse impact on the neighborhood. Members of the public made generalized statements to this effect but cited few specific examples. The Commission bears the burden of providing a record that factually supports a reason for denial. In most cases involving development in residential zones, neighbors are loathe to relinquish the benefits of fewer inhabitants. The specter of additional traffic, fewer open vistas and areas made more congested by people and automobiles is not a welcome one. The legislature, however, has determined that affordable housing is in the public interest and this fact outweighs the public's desire for a continuation of the status quo.
 Reason 10. The report of William G. Kweder, Planning Consultant, and Gerald J. Turbet, Town Engineer, to the Commission dated December 6, 1993, consisting of four pages, amplifies many of the reasons for denial set forth herein and said report is incorporated into this decision and the content thereof is given as an additional reason for denial.
By incorporating the Kweder report in its tenth reason for denial, the Commission has failed to support with sufficient evidence all the items of concern. For instance, Kweder expresses the concern that the setback waiver from 50 feet to 20 feet requested by the applicant conflicts with the building lines or setbacks which reflect the stated goal of zoning to provide light and air by keeping houses back from streets and highways and the noise, vibrations, fumes and dust emanating therefrom. There is no such evidence in the record that the difference of 30 feet significantly reduces the detrimental effects of noise, dust, fumes and vibrations as they relate to public health and safety. CT Page 62 Expert scientific evidence would be required in order for the Commission to bear the burden of proving its denial on this issue.
While other points Kweder raised have been discussed earlier herein, Kweder's ninth point has not.
Rinaldi bases his price for the affordable housing unit upon the formula provided in General Statutes, Secs. 8-30g and 8-39a. This price, however, does not include the price of the land. Rinaldi plans to retain ownership and charge rent for the land or to convey it to an association. If he sells it to an association or perhaps outright to the individual owners, the purchase price of the land will immediately skewer the formula for the price of the affordable housing units. The price of both the land and the units, if sold within the 20 year period, may no longer qualify as affordable housing under the statutes. There is insufficient information in the record to answer questions raised including, but not limited to, what will occur if the land is sold to an association, and the affordable housing units own a percentage interest; will that percentage interest be priced so that the residents of the affordable housing units will pay less for their land according to the formula than their neighbors? Will such lower cost be discriminatory? Will such lower costs entitle them to a lesser percentage of ownership? Will not the mere addition of any land cost affect the use of the formula within twenty (20) years? Will the cost of capital assessments affect the statutory formula so that the affordable housing units will be in breach of the restrictive covenant? If the land is rented to the unit owners, can costs remain steady within the formula in the face of rising costs for services such as snow plowing?
For the foregoing reasons, the decision of the Commission is reversed as to Reason 6 and remanded to the Commission as to Reason 10, Item 9 for further consideration of the financial impact on the formula and restrictive covenant in the event the land is sold to an association or to the affordable housing unit owner.
Leheny, J.