[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an appeal from a decision by the defendant denying the plaintiff's application for subdivision approval regarding a proposal to construct 35 residential units on property comprising of three separate lots consisting of approximately 24 acres. The appeal is taken pursuant to Connecticut General Statutes § 8-30g.
General Statutes § 8-30g provides in part as follows:
 Sec. 8-30g. Affordable housing land use appeals procedure.
(a) As used in this section: (1) "Affordable housing development" means a proposed housing development (A) which is assisted housing or (B) in which not less than twenty-five per cent of the dwelling units will be conveyed by deeds containing covenants or restrictions which shall require that such dwelling units be sold or rented at, or below, prices which will preserve the units as affordable housing, as CT Page 7377 defined in section 8-39a, for persons and families whose income is less than or equal to eighty per cent of the area median income or eighty per cent of the state median income, whichever is less, for at least thirty years after the initial occupation of the proposed development; (2) "affordable housing application" means any application made to a commission in connection with an affordable housing development by a person who proposes to develop such affordable housing; (3) "assisted housing" means housing which is receiving, or will receive, financial assistance under any governmental program for the construction or substantial rehabilitation of low and moderate income housing, and any housing occupied by persons receiving rental assistance under chapter 138a or Section 1437f of Title 42 of the United States Code, (4) "commission" means a zoning commission, planning commission, planning and zoning commission, zoning board of appeals or municipal agency exercising zoning or planning authority; and (5) "municipality" means any town, city or borough, whether consolidated or unconsolidated.
 (b) Any person whose affordable housing application is denied or is approved with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units, specified in subparagraph (B) of subdivision (1) of subsection (a) of this section, contained in the affordable housing development, may appeal such decision pursuant to the procedures of this section. . . .
 (c) Upon an appeal taken under subsection (b) of this section, the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission that (1)(A) the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record; (B) the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; (C) such public interests clearly outweigh the need for affordable housing; and (D) such public interests cannot be protected by reasonable changes to the affordable housing development or (2)(A) the application which was the subject of the decision from which such appeal was taken would locate affordable housing in an area which is zoned for industrial use and which does not permit residential uses and (B) the CT Page 7378 development is not assisted housing, as defined in subsection (a) of this section. If the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence in the record before it.
 (d) Following a decision by a commission to reject an affordable housing application or to approve an application with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units, the applicant may, within the period for filing an appeal of such decision, submit to the commission a proposed modification of its proposal responding to some or all of the objections or restrictions articulated by the commission, which shall be treated as an amendment to the original proposal. The filing of such a proposed modification shall stay the period for filing an appeal from the decision of the commission on the original application. The commission may hold a public hearing and shall render a decision on the proposed modification within forty-five days of the receipt of such proposed modification. . . .
 (f) Notwithstanding the provisions of subsections (a) to (e), inclusive, of this section, the affordable housing appeals procedure established under this section shall not be available if the real property which is the subject of the application is located in a municipality in which at least ten per cent of all dwelling units in the municipality are (1) assisted housing or (2) currently financed by Connecticut Housing Finance Authority mortgages or (3) subject to deeds containing covenants or restrictions which require that such dwelling units be sold or rented at, or below, prices which will preserve the units as affordable housing, as defined in section 8-39a, for persons and families whose income is less than or equal to eighty per cent of the area median income. The Commissioner of Economic and Community Development shall, pursuant to regulations adopted under the provisions of chapter 54, promulgate a list of municipalities which satisfy the criteria contained in this subsection and shall update such list not less than annually.
The plaintiff at all material times owned the property in question and, as such, is an aggrieved party. CT Page 7379
Under the provisions of § 8-30g (c), the burden is "on the commission to prove, based upon the evidence in the record compiled before such commission that (1)(A) the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record; (B) the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; (C) such public interests clearly outweigh the need for affordable housing; and (D) such public interests cannot be protected by reasonable changes to the affordable housing development. . . ." If the Commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence and the record before it.
The statutory mandate of § 8-30g (c) requires the court to consider the following issues:
1. THE ISSUE OF WHETHER THE DECISION FROM WHICH THIS APPEAL IS TAKEN AND THE REASON CITED FOR SUCH DECISION ARE SUPPORTED BY SUFFICIENT EVIDENCE IN THE RECORD.
2. THE ISSUE OF WHETHER THE DECISION IS NECESSARY TO PROTECT SUBSTANTIAL INTEREST IN PUBLIC HEALTH, SAFETY OR OTHER MATTERS WHICH THE COMMISSION MAY LEGALLY CONSIDER.
3. THE ISSUE OF WHETHER SUCH PUBLIC INTEREST CLEARLY OUTWEIGH THE NEED FOR AFFORDABLE HOUSING AND
4. THE ISSUE OF WHETHER SUCH PUBLIC INTERESTS CANNOT BE PROTECTED BY REASONABLE CHANGES TO THE AFFORDABLE HOUSING DEVELOPMENT.
The threshold issue is whether the plaintiff's housing application constituted an affordable housing development within the meaning of § 8-30g (a). An affordable housing development is a proposed housing development that is either an assisted housing, or in which not less than 25 percent of the dwelling units will be conveyed by deeds containing convenants or restrictions which shall require that such housing unit be sold or rented at, or below, prices which preserve the units as affordable housing, as defined in § 8-39a, for persons and families whose income is less than or equal to 80 percent of the CT Page 7380 area median income or 80 percent of the state median income, whichever is less, for at least thirty years after the initial occupation of the proposed development. . . ." In order for an affordable housing development to constitute assisted housing, it must be housing which is receiving, or will receive, financial assistance under any governmental program for the construction or substantial rehabilitation of low and moderate income housing, and any housing occupied by persons receiving rental assistance under chapter 138a or Section 1437f of Title 42 of the United States Code. There is no evidence in the record that this application meets the financial assistance requirement of § 8-30g
(a)(1)(A). However, the alternate 25 percent requirement of §8-30g (a)(1)(B) is met in this application. Section 26.1.4 of the proposed regulations provide as follows:
 An affordable housing development shall be deemed to mean a housing development which is "assisted housing" as defined in Conn. Gen. Stat. § 8-30g(a)(3); or (b) in which not less than twenty-five percent (25%) of the dwelling units will be held or conveyed by deeds containing convenants or restrictions which shall require that such dwelling units will be sold or rented at or below prices which will preserve the units as affordable housing as defined in § 8-39a of the Connecticut General Statutes, for persons and families whose income is less than or equal to eighty percent (80%) of the area median income or eighty percent (80%) of the State median income, whichever is less, for at least thirty years after the initial occupation of the proposed development.
At the present time, the town of Bridgewater housing stock that qualifies as affordable under the statute, amounts to approximately 1/8 of 1%. This appeal is therefore subject to the provisions of section 8-30g (subsection a) to (e) inclusive since the town of Bridgewater does not have at least 10% of all of its dwelling units consisting of affordable housing as meeting the provision of section 8-30g (f).
Following the defendant Commissions denial on July 9, 1997 the applicant submitted modifications to the application. This procedure is specifically authorized under the provisions of section 8-30g (d). The plaintiff on August 8, 1997 filed an appeal from the denial of July 9, 1997 and simultaneously submitted proposed modifications to the subdivision application. The Commission delayed responding to the proposed modification because of the pendency of the appeal. In order to expedite the CT Page 7381 matter the Commission agreed to act on the proposed modification and the court ordered that if the plaintiff finds the Commission's decision adverse that he may amend his complaint and the Commission will supplement the record. That is the procedure that has been followed in this case. Both parties agree that the present appeal has been properly taken from both the initial denial and the denial from the revised application.
The Commission at its special meeting held on March 18, 1998 gave the following five reasons for the denial of the revised application:
1. The application cannot provide for a safe road within the subdivision for the protection of future residents and for the safety of all passengers at the intersection at State Rd. 133 and the proposed road.
2. There is no adequate potable water supply for this subdivision. Any State, Municipal, DPUC or other approvals are missing.
3. The septic systems proposed cannot function adequately for this proposed subdivision.
4. Consideration was not given to protect and conserve unique and fragile resources as required by the BCIWC.
5. There is not sufficient evidence in the application to provide for the right of a "first cut".
In discussing the procedure to be followed in an appeal under § 8-30g, in West Hartford Interfaith Coalition. Inc. v. TownCouncil, 228 Conn. 498 (1994), the court stated in part at page 513 as follows:
 "Where a zoning [commission] has stated its reasons for its actions, the court should determine only whether the assigned grounds are reasonably supported by the record and whether they are pertinent to the considerations which the authority was required to apply under the zoning regulations. . . . The principle that a court should confine its review to the reasons given by a zoning [commission] does not apply to any utterances, however incomplete, by the members of the [commission] subsequent to their vote. [Rather, it] applies where the [commission] has rendered a formal, official, CT Page 7382 collective statement of reasons for its action." Thus, "where a zoning commission has formally stated the reasons for its decision, the court should not go behind that official collective statement . . . [and] attempt to search out and speculate upon other reasons which might have influenced some or all of the members of the commission to reach the commission's final collective decision." [Citations omitted; internal quotation marks omitted.]
The reasons given by the defendant Commission will be considered seriatam.
1. THE APPLICATION CANNOT PROVIDE FOR A SAFE ROAD WITHIN THE SUBDIVISION FOR THE PROTECTION OF FUTURE RESIDENTS AND FOR THE SAFETY OF ALL PASSENGERS AT THE INTERSECTION AT STATE RD. 133 AND THE PROPOSED ROAD.
The court finds that this reason cited for the decision is not supported by sufficient evidence in the record therefore finds that this reason was not a valid basis to deny approval for the application.
2. THERE IS NO ADEQUATE POTABLE WATER SUPPLY FOR THIS SUBDIVISION. ANY STATE, MUNICIPAL, DPUC OR OTHER APPROVALS ARE MISSING.
This court finds the following facts regarding this issue:
A number of consultants testified concerning the issue of adequate potable water supply for this subdivision.
The King's Mark Environmental Review Team which consists of a group of state environmental and health officials provided the following testimony:
 Water wells drilled into the bedrock in the Bridgewater area produce all their water from the bedrock fractures. Yield is a function of the number and interconnectness of fractures intersected by a well. As the density of fractures in granite is typically an order of magnitude less than that of normal metamorphic bedrock the feasibility of providing sufficient water supply for the Joshua Heights development, which is underlain entirely by granite, might be a cause for some concern.
CT Page 7383 At the May 14, 1997, public hearing, Christopher Allan of Land-Tech Consultants testified regarding concerns for adequate and safe water supply in stating in part as follows:
 The proximity of the watercourse that lies near the wetland boundary to the proposed septic systems of Lots 1 and 2 and to the overall development in general is of concern. There is a potential for significant water quality impacts on this watercourse due to the unusually large amount of wastewater to be disposed up gradient and from direct discharges of untreated storm water runoff.
The applicant did not receive any of the necessary State municipal, DPUC or other approvals that are required for the water supply system. There was no credible evidence presented that such approvals will be issued.
The court therefore finds that this reason cited for the decision is supported by sufficient evidence in the record and that this reason is necessary to protects substantial interest in the public health which the commission may legally consider. The court further finds that the public interest in adequate potable water supply for this subdivision clearly outweighs the need for affordable housing and that the public interest cannot be protected by reasonable changes to the affordable housing development.
3. THE SEPTIC SYSTEMS PROPOSED CANNOT FUNCTION ADEQUATELY FOR THIS PROPOSED SUBDIVISION.
The court finds the following facts regarding this issue:
At the April 9, 1997 public hearing on the application, the Commission received a report and testimony from Brian Curtis, P.E., of Nathan L. Jacobson Associates, inc. After reviewing all of the documents the plaintiff had submitted to date, Mr. Curtis concluded that "the plaintiff has not demonstrated that proposed lots are suitable for subsurface sewage disposal systems for the uses as proposed."
Mr. Curtis further found that the proposed design of the septic systems did not provide an adequate primary leach field system area; that portions of the leach field systems were not located a sufficient distance above bedrock; that certain percolation tests were not conducted deep enough to be at the CT Page 7384 proposed leach field system elevation, and that certain leach field systems were located too close to the property line.
Mr. Curtis also found that the septic systems for Lots 1 and 2 did not allow for sufficient nitrogen dilution for the wastewater in submitting the following:
 Dilution of nitrogen contained in the wastewater is of particular importance with this subdivision because of the relatively high number of proposed bedrooms per acre, the reliance upon on-site water supply wells for potable water supply, and the locations of proposed water supply wells interspersed between the individual subsurface sewage disposal systems.
 [T]he site is generally a shallow to bedrock site with unsaturated soils above fractured bedrock and the septic system locations are interspersed throughout the site amongst water supply well locations.
 And the primary concern being the effect of the septic systems on the nitrogen content of the water drawn from the ground for water supply and also the renovation of bacteria and virus that may be discharged into the septic systems and finds their way into the rock fractures in the wells prior to adequate renovation.
Christopher Allen, an environmental scientist with Land Tech Consultants testified in part as follows:
 While isolated deep pockets of soil may have been found during soil testing on the property, the large number of observed bedrock outcrops and presence of shallow soils significantly limits the ability of the site to treat the large quantity of sewage to be disposed. Since the soils are well drained to somewhat excessively drained, sewage will move rapidly through the soil. This rapid movement decreases the amount of time available for adequate treatment of the leachate within the soil. It is possible that untreated or partially treated sewage will surface down gradient of septic systems where the soil becomes shallow or where bedrock is exposed. Surfacing of sewage could result in the direct pollution of down gradient wetlands and water bodies. Untreated or partially treated sewage may also enter bedrock fractures down gradient of the systems causing pollution of CT Page 7385 the bedrock aquifer and water supply wells.
The King Mark Team report also stated in part as follows:
 Sewage disposal systems and wells are scattered throughout the three parcels. Highly permeable soils underlain by bedrock with moderate slopes and septic systems uphill from proposed well sites create a serious potential for partially treated sewage to enter one or more of these wells.
 The high density of development on each of the three parcels have generated concern for long term onsite sewage disposal and protection of wells. All onsite systems degrade water quality immediately adjacent to the leaching systems and with larger systems with greater discharges, the impact of the pollution plume may extend significantly beyond the direct areas of application.
The concerns that the commission had at the time of the hearing on the original application were not adequately addressed by the plaintiff when he submitted his modified plans. At the hearing on the modified plans the plaintiff submitted a letter from Frank Schaub, Supervising Sanitary Engineer, Connecticut Department of Health. That letter stated as follows:
1. No mention is made on plans as to the surveying accuracy of the plans or who provided the contours shown on plans. As you are aware, this parcel is relatively steep with great surficial irregularities and accurate survey information is necessary to confirm proper distances above ledge rock and groundwater. It is extremely difficult to design a septic systems to the nearest tenth of a foot if the contour information in the area of the septic system is not accurately shown.
2. A major concern exits with the protection of proposed wells on parcel 1. It appears blasting may be necessary for the construction of buildings 2 (lowest building) 3 and 4 (northeast building) with septic systems surrounding the wells serving buildings 2 and 3. We are aware that Mr. Carr is considering installation of a single water supply system for this lot in order to comply with code requirements for placement of wells at the highest location on each lot and to assure long term safe water supplies. Permeability testing performed on this parcel has identified relatively sandy soils. Exposed ledge rock and other bedrock noted in test holes creates serious concern for the CT Page 7386 protection of wells.
3. Based upon our review of the site plan [for lot 1], we could not recommend the Bridgewater Health Department issue permits to construct for any of the four buildings at this time.
4. As previously noted, four of the proposed five wells on the parcel [lot 2] are located down gradient from proposed leaching systems. It appears some blasting would be necessary for construction of buildings 2, 3 and a portion of the roadway adjacent to building 5. Concern for providing adequate water supply from wells properly spaced from potential sources of pollution is critical. Mr. Carr is working with staff engineers in our Water Supply Section to address this problem. The proposed wells serving buildings 2, 3, 4 and 5 do not meet minimum code requirements for placement at the highest portion of the property.
Although the applicant was invited by Mr. Schaub to resubmit his plans after he had made the recommended changes so that a final technical review could be completed, he elected not to resubmit his plans to the Department of Health.
At the March 11, 1998 public hearing on the modified application, the Commission heard testimony and received reports from a number of experts who concluded that modified proposed septic systems negatively impact ground water and surface water supply and that the septic systems did not afford the proper nitrogen dilution. Further the septic system in lot 3 would likely result in the discharge of partially treated sewage to the down gradient wetland system.
This court finds that this reason cited for the decision is supported by sufficient evidence in the record and that it is necessary to protect substantial interest in public health which the Commission may legally consider. Further the public interest clearly outweighs the need for affordable housing and the public interest cannot be protected by reasonable changes to the affordable housing development.
4. CONSIDERATION WAS NOT GIVEN TO PROTECT AND CONSERVE UNIQUE AND FRAGILE RESOURCES AS REQUIRED BY THE BCIWC.
The court finds the following facts regarding this issue: CT Page 7387
Christopher Allan, of Land-Tech Consultants, Inc., presented oral and written testimony to the Commission concerning the impact the proposed development would have on the area's natural resources. He testified that species diversity and composition would be significantly altered as a result of site development, including a decline in woodland wildlife species and amphibian groups. There was also evidence presented to the Commission that the discharge of untreated storm water runoff and septic system leachate would significantly impair site's wetland and water resources.
This reason cited for the decision is supported by sufficient evidence in the record and is necessary to protect a substantial interest that the public has in wet lands which the Commission may legally consider. However, the court finds that the public interest in the wetland does not outweigh the need for this affordable housing, therefore the court finds that this is not a valid reason for rejecting the application.
5. THERE IS NOT SUFFICIENT EVIDENCE IN THE APPLICATION TO PROVIDE FOR THE RIGHT OF A "FIRST CUT".
The applicant did not present to the Commission any information regarding the proposed use of "Lot A". The court finds that this reason cited is supported by sufficient evidence in the record. However, the court finds that this reason is not necessary to protect any substantial interest in the public health, safety or other matters which the Commission may legally consider. The court further finds that the public interest in this reason does not outweigh the need for affordable housing and further finds that whatever public interest there is can be protected by reasonable changes to the affordable housing development by simply not approving of Lot A as part of the application. The court therefore finds this was not a valid reason to deny approval for the application.
 ORDER
For all of the reasons stated regarding the denial resulting from the potable water supply and from the septic system, the court finds that the Commission has sustained its burden and therefore the appeal is dismissed.
Sidney Axelrod Judge of the Superior Court CT Page 7388